IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ESTATE OF ELEANOR NORTHINGTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF INDIANAPOLIS, LANE COOPER, | ) | Case No. 1:21-cv-406-TWP-TAB |
| ROBERT HALEY, JR., JUSTIN HYDE, | ) | |
| BRUCE JACKSON, and RONALD MONDAY, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

Eleanor Northington had long suffered from bipolar disorder and schizophrenia, and was off her medication for years. One thing that helped was attending church service. In February 2019, Northington's family took her to a church prayer service to lift her mood. But at the service, Northington turned erratic and belligerent; she began spitting at and physically assaulting parishioners, and removed her clothes.

Bruce Jackson, an off-duty police officer attending the service, with help from parishioners, tried to calm Northington for nearly an hour and a half. Jackson then called 911 and requested police assistance. When officers arrived and tried to talk with Northington, she struck them with closed fists.

A brief struggle ensued. Officers managed to detain the three-hundred-pound Northington in three sets of handcuffs behind her back within a few minutes. They then moved her from the church pews and placed her on the floor in the center aisle. Northington kicked, thrashed, spit, and tried to bite them, and continued this resistance on the

floor.

Soon after officers tried to control and subdue her on the floor, she had trouble breathing. They removed the handcuffs and initiated CPR while waiting for medics. The entire incident—from the time officers arrived to the time she had trouble breathing—lasted about five minutes.

The medics took Northington to the hospital. She never regained consciousness and died two days later. Northington's Estate then sued the five individual officers for excessive force under the Fourth Amendment and the City of Indianapolis for battery under state law.

These claims fail. Northington's death was undeniably tragic, but her Estate waited too long to sue the officers, and its claims against them do not relate back to its initial complaint where it named the John Doe defendants. This is reason enough to dismiss the federal claims.

But untimeliness aside, the officers committed no constitutional violations. And to the extent they did, qualified immunity protects them. Similarly, the City is immune under Indiana's use-of-force immunity statute from the battery claim. Even if it weren't, the officers' conduct was objectively reasonable under the circumstances.

## Statement of Material Facts Not In Dispute

### 1. Eleanor Northington's history.

In 2007, doctors diagnosed Northington with bipolar disorder and schizophrenia. [Dkts. 74-1 at 21 (Montgomery Dep. 21:6-15); 74-12 at 3] In 2017, she was admitted to the hospital for a depression breakdown. [Dkt. 74-1 at 23-24 (Montgomery Dep. 23:9-24:15)]

But February 2019 was particularly challenging: Northington's boyfriend had just moved out because he couldn't cope with her mental health issues. [*Id.* at 15:6-16:6] And Northington's daughter, D'Asia Montgomery, moved in with Northington to keep an eye on

At that time, Northington was restless, not eating, pacing back and forth, taking cold showers, and pulling her hair out. [Dkts. 74-1 at 26 (Montgomery Dep. 26:1-20); 74-12 at 7-8] Nor had she taken her prescribed medications for two to three years. [Dkts. 74-1 at 22-23 (Montgomery Dep. 22:2-23:8); 74-5 at 50 (Jackson Dep. 50:11-21); 74-12 at 4]

## 2. The February 6, 2019 incident.

One thing that helped Northington in the past was attending church services. [Dkt. 74-1 at 29 (Montgomery Dep. 29:20-21)] Montgomery and Northington had attended the Christ Our Healer church service many times before. [*Id.* at 33:1-8] Montgomery wanted to lift Northington's spirits and calm her down, so on February 6, 2019, Montgomery drove Northington, Northington's other two minor children, and Montgomery's boyfriend Daniel Reese to the church prayer service.[1] [Dkts. 74-1 at 28-29; 36 (Montgomery Dep. 28:21-29:19; 36:9-16); 74-12 at 4; 6]

Northington and her family arrived when the service began at 7:00PM and sat in the pews; then Northington got up to interact and participate in the worship. [Dkt. 74-1 at 37-38 (Montgomery Dep. 37:19-38:3)] About 30-40 parishioners were present. [*Id.* at

---

[1] Reese was a drummer for the church band and played on Wednesdays during the prayer service, which started at 7:00PM. [Dkt. 74-1 at 30; 36 (Montgomery Dep. 30:17-31:25; 36:17-19)]

37:24-38:6] Northington soon became disruptive and church leaders conducting the service told her to sit down. [*Id.* at 38:4-11]

Officer Bruce Jackson, an off-duty Indianapolis Metropolitan Police Department behavioral health specialist, attended the church service for a few years, and attended on February 6, 2019. [Dkts. 74-5 at 5; 7 (Jackson Dep. 5:5-22; 7:1-4); 74-10 at 1]. Jackson arrived before Northington; he observed her walking around during service, raising her hands, and pumping them in the air. [Dkt. 74-5 at 11; 20 (Jackson Dep. 11:7-10; 20:7-20)] She would disappear for several minutes at a time.[2] [Dkt. 74-5 at 20 (Jackson Dep. 20:20-22)]

At one point, Northington went to the bathroom for ten or fifteen minutes. [Dkt. 74-1 at 38; 41 (Montgomery Dep. 38:12-15; 41:21-23)] There, Northington removed her clothing, and some female parishioners had to help dress her. [*Id.* at 43:23-44:4] Meanwhile, Montgomery and her siblings remained in the pews. [*Id.* at 43:4-7]

When Northington returned, her behavior and demeanor changed drastically. [*Id.* at 40:8-13] According to Montgomery, Northington went into "attack mode." [*Id.* at 40:16; 44:17-20] Northington approached the pulpit and beat on it. [Dkt. 74-5 at 20 (Jackson Dep. 20:23-25)] Then she went to a pew where a woman was holding a child, grabbed the woman by the hair, and started punching her in the face. [Dkts. 74-1 at 40 (Montgomery Dep. 40:16-18; 74-5 at 21 (Jackson Dep. 21:4-8)] This prompted Officer Jackson, with help from other parishioners, to intervene and separate Northington from the woman and child. [Dkt. 74-5 at 21 (Jackson Dep. 21:8-12)]

---

[2] When Northington tried to leave the church, parishioners—who followed her for safety reasons—did not allow her to. [Dkt. 74-1 at 42 (Montgomery Dep. 42:8-21)]

But this only made Northington more aggressive. [Dkt. 74-1 at 40 (Montgomery Dep. 40:20-25)] She yelled at parishioners—calling them lesbians and homosexuals. [Dkt. 74-1 at 46 (Montgomery Dep. 46:15-19)] She spat on them and ran around the church. [Dkts. 74-1 at 45-46 (Montgomery Dep. 45:24-46:2); 74-5 at 21 (Jackson Dep. 21:15-16)] She instigated fights with men and punched them in the face. [Dkt. 74-5 at 21 (Jackson Dep. 21:13-14)] The church had to stop the service because the disruption was so significant. [Dkt. 74-1 at 50 (Montgomery Dep. 50:14-25)] Montgomery had never seen Northington like this before. [*Id.* at 56:19-20]

Jackson observed Northington exhibit this bizarre, aggressive, and violent behavior. [Dkt. 74-5 at 25 (Jackson Dep. 15:9-15)] Northington, who weighed more than three-hundred pounds and was sweating profusely, also appeared to have startling physical strength. [Dkts. 74-5 at 16 (Jackson Dep 16:3-18); 74-15 at 5] Northington wanted the pastor to pray for her, and when he did, she calmed down temporarily. [Dkt. 74-1 at 41 (Montgomery Dep. 41:1-5)] Nevertheless, Northington still hit anyone who approached her. [*Id.* at 45:2-23] Then Northington attacked another male pastor, and continued spitting on and punching parishioners in the face. [Dkt. 74-5 (Jackson Dep. 21:1-24)]

### A.  Jackson requests police assistance.

At 8:23PM, Jackson decided to call the police and request their assistance. [Dkts. 74-5 at 22 (Jackson Dep. 22:6-10); 74-13 at 6; 28-29] The Computer-Aided Dispatch ("CAD") reflects that a dispatch was broadcast about a black female who was being combative and refusing to leave. [Dkt. 74-13 at 6; 28]

In the interim, Jackson spoke with Montgomery about Northington's mental-

health issues. [Dkt. 74-5 at 26 (Jackson Dep. 26:2-10)] Montgomery explained that North-

ington was a paranoid schizophrenic, and had been off her medication for two to three

years. [Dkt. 74-5 at 26; 50 (Jackson Dep. 26:3-10; 50: 11-21)] For his part, Jackson believed

Northington was mentally ill and wanted to help her. [Dkt. 74-5 at 22 (Jackson Dep. 22:11-

21)]

**B. Officers arrive on scene.**

Officers Robert Haley, Jr. and Lane Cooper arrived at the church about the same

time at 8:33PM. [Dkts. 74-2 at 4-5 (Cooper Dep. 4:18-5:1); 74-3 at 10 (Haley Dep. 10:5-15);

74-13 at 27] They met Officer Jackson and a pastor in the foyer. [Dkts. 74-2 at 7 (Cooper

Dep. 7:20-23); 74-3 at 8-10 (Haley Dep. 8:16-10:19); 74-5 at 24-25 (Jackson Dep. 24:11-24;

25:18-23)] Jackson told them that Northington was mentally ill, exhibiting aggressive and

bizarre behavior, and assaulting people. [Dkts. 74-3 at 8; 11-12 (Haley Dep. 8:21-24; 11:25-

12:5); 74-5 at 26 (Jackson Dep. 26:2-3)]

Jackson also informed Officer Haley that Northington was spitting on people, and

that he and others tried to de-escalate the situation, but Northington was uncooperative.

[Dkt. 74-5 at 49 (Jackson Dep. 49:10-15)] Finally, Haley was told that Northington needed

an immediate detention. [Dkt. 74-3 at 10-11 (Haley Dep. 10:20-11:3)] Thus, at 8:34PM—

eleven minutes after Jackson called 911—Haley requested an ambulance for her to be

transported to the hospital before Haley even entered the sanctuary. [Dkts. 74-3 at 11; 14

(Haley Dep. 11:18-24; 14:12-15); 74-14 at 5; 74-13 at 6; 27]

Officers Cooper and Haley planned to talk to Northington to check on her well-

being, and tell her that they wanted to help her. [Dkt. 74-3 at 12 (Haley Dep. 12:12-19)] As

they entered the church, they split up—Haley went to the right, while Cooper veered to the left. [Dkt. 74-3 at 12 (Haley Dep. 12:19-20)] Cooper and Haley observed Northington sitting in the pews near the back of the church. [Dkts. 74-2 at 9 (Cooper Dep. 9:14-18); 74-5 at 23-24 (Jackson Dep. 23:25-24:10)]

### C. Northington assaults officers and a struggle ensues to get her detained.

After an apparent calm, Northington's aggression quickly returned upon seeing the officers. [Dkt. 74-1 at 41 (Montgomery Dep. 41:6-10)] Haley approached Northington and introduced himself; Northington stood up and asked, "oh they called you guys?" [Dkts. 74-2 at 9 (Cooper Dep. 9:19-21); 74-3 at 12 (Haley Dep. 12:21-23)] She then approached Haley and punched him in the face. [Dkts. 74-2 at 9 (Cooper Dep. 9:22-24); 74-3 at 13 (Haley Dep. 13:1-6); 74-5 at 27 (Jackson Dep. 27:2-12)]

Haley stumbled back and realized that a voluntary transport of Northington to the hospital was not in the cards. [Dkt. 74-3 at 13 (Haley Dep 13:15-19)] After Northington struck Haley, she set her sights on Officer Cooper and started hitting him too. [Dkts. 74-1 at 45; 47 (Montgomery Dep. 45:12-18; 47:13-17); 74-3 at 18 (Haley Dep. 18:7-9)] Officer Jackson and the pastor tried to stop Northington as she punched Cooper in the head and face. [Dkts. 74-3 at 18-19 (Haley Dep. 18:10-19:1); 74-7 at 1-2] Haley got on the radio to indicate that they had a "resistor." [Dkt. 74-3 at 18 (Haley Dep. 18:15-16)]

The group focused on getting Northington detained in handcuffs, but she actively resisted. [Dkts. 74-1 at 47-48 (Montgomery Dep. 47:18-48:4); 74-3 at 19 (Haley Dep. 19:7-24); 74-5 at 16 (Jackson Dep. 16:23-24)] Officer Cooper then grabbed one of her arms, and Officer Jackson grabbed the other. [Dkts. 74-2 at 9-10 (Cooper Dep. 9:25-10:2); 74-5 at 27-

28 (Jackson Dep. 27:9-28:1)]

When Officer Hyde arrived,[3] he saw a group of people standing and engaged in a struggle in the church pews. [Dkt. 74-4 at 11 (Hyde Dep. 11:1-21)] Three were uniformed officers; one was in plain clothes, and Northington. [Dkt. 74-4 (Hyde Dep. 13:3-14:5)] The group stumbled; Northington managed to break away from Officer Jackson and used that arm to "hammer fist punch" Cooper in the back of the head. [Dkt. 74-2 at 10 (Cooper Dep. 10:2-6)] Jackson tried to do a leg sweep of Northington but was unsuccessful. [Dkt. 74-5 at 27 (Jackson Dep. 27:8-9)]

After Haley regained control of her arm, Northington briefly fell in between the pews, pulling away as she tried to spit and bite officers. [Dkt. 74-2 at 10 (Cooper Dep. 10:7-17)] But they were not on the floor with her. [Dkt. 74-2 at 11; 14 (Cooper Dep. 11:6-13; 14:18-21)] Northington's feet were still on the floor, and the officers leaned against the pews. [Dkt. 74-2 at 16-17 (Cooper Dep. 16:25-17:7)] Still, she resisted and tried to punch officers. [Dkt. 74-5 at 29-30 (Jackson Dep. 29:21-30:4)]

The officers got a hold of her arm and applied one set of cuffs, but they needed additional sets because of her size. [Dkt. 74-5 at 31 (Jackson Dep. 31:10-13)] Within a couple of minutes from the time that Cooper and the other officers entered the church, they managed to get three sets of handcuffs on Northington with her hands behind her back while she was seated in or leaning against the pews. [Dkts. 74-2 at 10; 17 (Cooper Dep.

---

[3] Hyde backed onto the run (i.e., went to the church to assist with the incident) after he heard officers on the radio request assistance because they had a resistor—an individual resisting law enforcement. [Dkt. 74-4 at 9-10 (Hyde Dep. 9:18-10:1)]

10:22-24; 17:9-12); 74-3 at 20-21 (Haley Dep. 20:5-21:5); 74-5 at 29-31 (Jackson Dep. 29:5-13; 30:25-31:20)]

When Officer Monday arrived[4], he saw Officer Haley and Cooper standing near Northington, who was detained in handcuffs and sitting in the pews, but still twisting, thrusting, and wildly moving—in essence actively resisting. [Dkts. 74-6 at 10-11 (Monday Dep. 10:10-11:12); 74-11 at 1-2] She was also spitting a lot. [Dkt. 74-5 at 30 (Jackson Dep. 30:23-24)] During the tussle, someone—other than the officers—took a cloth and tied it over the bridge of Northington's nose to prevent her from spitting and biting.[5] [Dkts. 74-2 at 10 (Cooper Dep. 10:18-21); 74-6 at 13 (Monday Dep. 13:18-25)]

**D. Officers move Northington from the pews to the center aisle.**

The goal in responding to an active disturbance is to ensure the safety of those involved by securing the individual causing the disturbance. [Dkt. 74-4 at 30 (Hyde Dep. 30:11-21)] And even after being handcuffed, Northington still kicked, screamed, spat, and resisted; so for her and everyone else's safety, the officers wanted to isolate her from everyone else. [Dkts. 74-3 at 22 (Haley Dep. 22:8-17); 74-6 at 10-11 (Monday Dep. 10:21-11:12)] The officers decided to move her from the pews into the center aisle in between the pews. [Dkts. 74-2 at 10; 16-17 (Cooper Dep. 10:24:11:2; 16:8-13; 17:17-22); 74-3 at 24-25 (Haley Dep. 24:15-25:3); 74-4 at 14 (Hyde Dep. 14:10-20); 74-5 at 32 (Jackson Dep. 32:16-17) 74-6

---

[4] Monday received notice of a radio dispatch of a resistor while in his police car, and responded to the scene. [Dkt. 74-6 at 9 (Monday Dep. 9:9-20)]

[5] Montgomery did not see Northington after she was detained because Montgomery took her siblings to another part of the church out of view of the incident. [Dkt. 74-1 at 48-49 (Montgomery Dep. 48:5-49:22)]

at 10-17 (Monday Dep. 10:24-11:2; 11:17-25; 12:2-5; 13:18-25; 14:21-24; 16:8-13; 17:17-22)]

Monday took her right arm; another officer took her left arm, and then they moved her to the center aisle between the pews. [Dkt. 74-6 at 12 (Monday Dep. 12:11-18)] While the officers walked her out to the center aisle, she continued to give them trouble by re-sisting and twisting around. [Dkts. 74-2 at 17-18 (Cooper Dep. 17:17-18:1); 74-5 at 52 (Jack-son Dep. 52:21-23); 74-6 at 12-13 (Monday Dep. 12:6-13:4)]

As they did so, Northington tripped on a bench and fell; Jackson fell too injured and himself, and briefly removed himself from the picture. [Dkts. 74-3 at 22 (Haley Dep. 22:18-25); 74-5 at 33; 52 (Jackson Dep. 33:1-5; 52:17-20)] The officers placed Northington on the floor because she continued to kick, thrash, bite, and spit. [Dkt. 74-2 at 11; 18 (Cooper Dep. 11:3-5; 18:9-14)] Northington was on her side but then she rolled to her stomach because she was still kicking and moving. [Dkt. 74-3 at 25 (Haley Dep. 25:16-25)]

**E.  Northington has breathing difficulties as officers subdue her.**

Northington's whole body was in the center aisle after they moved her. [Dkt. 74-5 at 53 (Jackson Dep. 53:5-8)] She continued to thrash, kick, resist arrest, and move around on the floor. [Dkts. 74-3 at 25-26; 40 (Haley Dep. 25:11-26:12-14; 40:18-25); 74-5 at 53-54 (Jackson Dep. 53:22-54:4); 74-6 at 15 (Monday Dep. 15:12-14)] Northington did this up until her breathing troubles started. [Dkts. 74-2 at 10-11 (Cooper Dep. 10:24-11:5); 74-3 at 40-41 (Haley Dep. 40:18-41:4) 74-4 at 23-24 (Hyde Dep. 23:15-24:19); 74-5 at 53-54 (Jackson Dep. 53:22-54:4); 74-6 at 15 (Monday Dep. 15:3-14)]

When Hyde saw Northington kicking her legs and flailing, he knelt down and placed his hands and knees on her legs to try to control and secure Northington's legs.

[Dkts. 74-2 at 19 (Cooper Dep. 19:9-13); 74-4 at 17 (Hyde Dep.  17:1-21); 74-6 at 15 (Monday Dep. 15:15-22); 74-9 at 2] Hyde's objective was to secure her legs and keep the officers and parishioners safe. [Dkt. 74-4 at 18 (Hyde Dep. 18:16-23); 74-9 at 2] He did not think North-ington was at risk for positional asphyxia. [Dkt. 74-4 at 20 (Hyde Dep. 20:3-15)]

Monday, who was near Northington's right arm and shoulder, tried to talk to her and calm her down, and told her she was going to the hospital. [Dkt. 74-6 at 15-16 (Mon-day Dep. 15:7-16:18)] Officer Cooper positioned his knee on Northington's lower back—for about five seconds—to prevent her from rolling over because she was still kicking, spitting, and trying to get up. [Dkts. 74-3 at 26; 38-39 (Haley Dep. 26:15-21; 38:22-39:14); 74-6 at 17 (Monday Dep. 17:10-15)]

Officer Haley was standing near Northington's head; he saw Cooper place his knee on Northington's back, and Haley told Cooper immediately to remove it, which Cooper did. [Dkts. 74-3 at 26-27; 31 (Haley Dep. 26:1-25; 27:11-18; 31:2-5); 74-6 at 17 (Mon-day Dep. 17:2-9); 74-8 at 2] Cooper did not place all—or even a majority of—his weight on his knee.[6] [Dkt. 74-3 at 39 (Haley Dep. 39:15-22); 74-8 at 2] At some point, Haley heard Northington say, "get off of me" but he also knew that she was a "really violent resistor because [he] remember[s] asking on the radio for leg restraints, and [they] rarely ever call for that, because she was so out of control and hard to control." [Dkt. 74-3 at 28 (Haley Dep. 28:2-11)]

---

[6] It is a common police technique to place a knee or foot on a detainee's back as leverage to maintain control of them if they are continuing to kick or thrash around. [Dkt. 74-5 at (Jackson Dep.  36:5-37:2)]

Monday and Haley noticed a problem with Northington's breathing. [Dkt. 74-3 at 34 (Haley Dep. 34:22-25); 74-6 at 17-18 (Monday Dep. 17:16-18:13)] Haley told the group that "something's not right," and they backed up. [Dkt. 74-3 at 35 (Haley Dep. 35:1-5)] At this point, Northington was only on the floor for one to two minutes. [Dkts. 74-2 at 21 (Cooper Dep. 21:7-9); 74-3 at 34 (Haley Dep. 34:12-17); 74-4 at 23-24 (Hyde Dep. 23:15-24:1); 74-5 at 35 (Jackson Dep. 35:8-11); 74-6 at 17-18 (Monday Dep. 17:19-18-4)]

First, they removed the cloth from Northington's face. [Dkt. 74-3 at 32; 35 (Haley Dep. 32:14-19; 35:17-36:1)] Officer Cooper then uncuffed her, rolled her onto her stomach, and tried to determine whether she was breathing. [Dkts. 74-2 at 21-22 (Cooper Dep. 21:23-22:4); 74-4 at 24-26 (Hyde Dep. 24:20-25:15; 26:1-7); 74-6 at 18-20 (Monday Dep. 18:17-19:1; 20:16-24) They checked for a pulse and could not find it. [Dkt. 74-2 at 22-23 (Cooper Dep. 22:5-6; 23:13-16)]

CPR was started. [Dkts. 74-2 at 22 (Cooper Dep. 22:6-8); 74-3 at 36-37 (Haley Dep. 36:12-24; 37:7-12); 74-5 at 35 (Jackson Dep. 35:16-23); 74-6 at 14 (Monday Dep. 14:8-16)] This continued until medics arrived. [Dkt. 74-4 at 26 (Hyde Dep. 26:8-15)] Haley looked for a defibrillator in the church but could not find one. [Dkt. 74-3 at 36-37 (Haley Dep. 36:24-37:6)]

The entire incident—from the time that Northington first punched Haley and Cooper until officers determined that she was breathing abnormally—was about five minutes. [Dkts. 74-2 at 25 (Cooper Dep. 25:5-11); 74-3 at 39-40 (Haley Dep. 39:23-40:3); 74-5 at 51-53 (Jackson Dep. 51:13-19; 53:13-17)] Northington actively resisted arrest, kicked,

thrashed, and spat the entire time she was on the floor until she began breathing abnormally. [Dkts. 74-2 at 40 (Haley Dep. 40:4-8); 74-5 at 53-54 (Jackson Dep. 53:22-54:1); 74-6 at 21 (Monday Dep. 21:4-8)]

### F.  Northington's hospitalization and death.

An ambulance arrived at the church about ten minutes later and transported Northington to Eskenazi hospital. [Dkt. 74-1 at 52 (Montgomery Dep. 52:1-19)] She was placed on a ventilator but showed little brain activity. [*Id.* at 53:3-5] At the doctors' recommendation, Northington was removed from life support the next day. [*Id.* at 54:2-7]

The Marion County Coroner's Office performed an autopsy after Northington's death. [Dkt. 74-15] The MCCO concluded that Northington's cause of death was "Anoxic Brain Injury in the Setting of Morbid Obesity, Cardiac Hypertrophy, Schizophrenia, and Struggle with Others." [*Id.* at 1] The autopsy report noted no internal trauma to Northington's backside. [*Id.* at 6] No officer was charged with any criminal offense related to the February 6, 2019 incident.[7] [Dkts. 74-7 at 2; 74-8 at 3; 74-9 at 2; 74-10 at 2; 74-11 at 2] And IMPD's special investigations unit ("SIU") did not conduct any investigation into whether any officer committed any criminal offense. [Dkt. 74-7 at 2]

_____

[7] Officer Jackson testified that if he saw misconduct from other officers, he would have intervened and responded. [Dkt. 74-5 at 48 (Jackson Dep. 48:5-9)] He did not. [*Id.* at 48:10-12] After the incident, IMPD conducted an internal affairs investigation into the officers' conduct. [Dkts. 74-7 at 2; 74-8 at 3; 74-9 at 2; 74-10 at 2; 74-11 at 2] The IA investigation concluded that no officer violated any IMPD policy, rule, and regulation, or general order. [*Id.*] All officers were acting with the course and scope of their employment with the City of Indianapolis. [Dkts. 74-7 at 1; 74-8 at 1; 74-9 at 1; 74-10 at 1; 74-11 at 1]

**Argument**

1. **The Estate filed no statement of claims, so its claims are limited to those raised in its second amended complaint—which have not been otherwise dismissed by stipulation of the parties.**

The Estate filed three complaints, *see* [Dkts. 1-2, 20, 25], and counsel stipulated to dismissing certain claims and non-liable parties. [Dkts. 14, 47, 48] On top of that, the Estate did not file a statement of claims as the Case Management Plan required.[8] [Dkt. 29 at 5]

This means the Estate's claims consist of those enumerated in the second amended complaint, which have not been otherwise dismissed. See *Von Duprin LLC v. Moran Elec. Serv., Inc.*, 2019 WL 535752, at *7-8 (S.D. Ind. Feb. 11, 2019) (Pratt, J.). Those claims are a Fourth Amendment excessive-force claim against each officer, and a state-law battery claim against all Defendants. [Dkt. 25 at 4-5] For the reasons below, the Defendants are entitled to summary judgment on all claims.

2. **The Estate's federal claims against the officers do not relate back under Fed. R. Civ. P. 15(C) and are therefore untimely.**

The Estate waited too long to sue the officers for any constitutional violations. The "John Does" named in its initial complaint do not suffice. Nor does the officers' late addition to the case relate back to the original complaint under Rule 15. This is especially so the Estate's counsel *possessed* the officers' names as early as January 2020, but simply

_____

[8] See generally *Harris v. Carrier Corp.*, 2017 WL 4037658, at *2 (S.D. Ind. Sept. 13, 2017) (explaining importance of statement of claims and indicating that a party may not pursue a claim not included in its statement of claims); *Schambers v. Key Fam. of Cos.*, 2018 WL 1794915, at *7 (S.D. Ind. April 16, 2018) (same); *Henderson v. City of Indianapolis*, 2020 WL 419345, at *2 (S.D. Ind. Jan. 27, 2020) (same).

chose not to sue them within the statute of limitations.

The church incident occurred on February 6, 2019. [Dkt. 74-13 at 6; 28-29] Suits under § 1983 use the statute of limitations that states employ for personal-injury claims. *Richards v. Mitcheff,* 696 F.3d 635, 637 (7th Cir. 2012). "Indiana allows two years." *Id.* (*citing* IND. CODE § 34-11-2-4). This means that the Estate needed to sue the officers by February 6, 2021. *Id.* It failed to do so. *See* [Dkt. 1-3 at 1]

Instead, the Estate sued the City of Indianapolis, the Indianapolis Metropolitan Police Department, and John Doe Police Officers 1-50 in its initial complaint. See [*id.*]. The Estate then filed an amended complaint on March 30, 2021, *see* [Dkt. 20], but it still had not sued the officers. *Id.* Finally, on April 2, 2021—nearly two months after the statute of limitations ran—the Estate amended a second time to name them.[9] [Dkt. 25]

The purpose of Rule 15(c) is to allow amended complaints to relate back to original filings for statute of limitations purposes when the amended complaint is correcting a mistake about the identity of the defendant. See *Worthington v. Wilson,* 8 F.3d 1253, 1256 (7th Cir. 1993) (relation-back applies when the amendment is made "to correct a misnomer of a defendant where the proper defendant is already before the court and the effect is merely to correct the name under which he is sued.").

Under Rule 15(c)(1)(C), an amendment to a pleading that "changes the party or the naming of the party against whom a claim is asserted" can only relate back to the date of the original pleading if the added party "knew or should have known that the action

---

[9] In their Answer and affirmative defenses, the Defendants informed the Estate that the claims against the officers were untimely and did not relate back. *See* [Dkt. 30 at 10].

would have been brought against it, *but for a mistake concerning the proper party's identity*."
(emphasis added). This is where the Estate falls short.

Well before the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A.*, 560
U.S. 538 (2010), the Seventh Circuit had held that naming a John Doe defendant—due to
lack of knowledge of his identity—was not a mistake under Rule 15(c). See *Wood v. Wor-
achek*, 618 F.2d 1225, 1230 (7th Cir. 1980) (stating that Rule 15(c) "does not permit relation
back where there is a lack of knowledge of the proper party"); *Worthington*, 8 F.3d at 1257
(explaining that a plaintiff's "lack of knowledge" as to the defendants' identities does not
amount to "a mistake in their names"); *Hall v. Norfolk S. Ry. Co.*, 469 F.3d 590, 596 (7th Cir.
2006) (same).

In *Krupski*, the Supreme Court examined whether Rule 15(c)(1)(C) allowed
amended pleadings to relate back when the plaintiff mistakenly sued a subsidiary, only
to later realize that she meant to sue its parent corporation. 560 U.S. at 543–44. Holding
that the plaintiff made a "mistake" allowing her pleadings to relate back, the Court ex-
plained that whether an amended pleading relates back depends on "what the prospec-
tive *defendant* knew or should have known" and "not what the *plaintiff* knew or should
have known." *Id.* at 548.

In reaching this conclusion, the Court defined mistake as "[a]n error, misconcep-
tion, or misunderstanding; an erroneous belief," *id.* (alteration in original) (quoting
Black's Law Dictionary 1092 (9th ed. 2009)), and further described the word to include "'a
misunderstanding of the meaning or implication of something'; 'a wrong action or state-

ment proceeding from faulty judgment, inadequate knowledge, or inattention'; 'an erroneous belief'; or 'a state of mind not in accordance with the facts.'" *Id.* (quoting Webster's Third New International Dictionary 1446 (2002)).

But importantly, the Court made clear that a plaintiff's deliberate choice to sue one party over another while "fully understanding factual and legal differences" between them is "the antithesis of making a mistake concerning the proper party's identity." *Id.* at 549.

As relevant here, "*Krupski* provides that when a plaintiff is fully aware of a potential defendant's identity and makes a conscious choice not to name that person as a defendant, there is no mistake and Rule 15(c)(1)(C) is inapplicable." *Jones v. Mathews*, 2018 WL 9878317, at *7 (C.D. Ill. Dec. 11, 2018) (citing *Krupski*, 560 U.S. at 549).

And recently, the Seventh Circuit examined *Krupski* anew and reaffirmed the "John Doe rule." *See Herrera v. Cleveland*, 8 F.4th 493 (7th Cir. 2021). In *Herrera*, Justin Herrera, sued three John Doe correctional officers about two weeks before the statute of limitations lapsed. *Id.* at 495. Then he wrote letters to the sheriff to identify the names and badge numbers of the correctional officers, and the sheriff provided Herrera the same. *Id.*

About a year after the statute lapsed, Herrera amended his complaint to add the correctional officers by name to replace the John Doe defendants. *Id.* at 495-96. The officers moved to dismiss the complaint—arguing that although the initial complaint naming the John Doe officers was timely, the amendment adding the officers by name was not, and did not relate back under Rule 15(c)(1)(C)(ii) because Herrera made no mistake about their identity.

17

The Seventh Circuit held that naming a John Doe defendant does not constitute a mistake under Rule 15(c)(1)(C)(ii) for three reasons. *Id.* at 498. First, it said that naming a John Doe is not based on an error, misconception, misunderstanding, or "mere slip of the pen." *Id.* It's an intentional and informed decision—the opposite of a mistake. *Id.* Second, the Court emphasized the difference between a John Doe case and a *Krupski* one, where in the latter circumstance a plaintiff is unaware that she lacks knowledge of the proper defendant's identity. But with John Does, a plaintiff *is* aware that they lack knowledge of the defendant's identity. *Id.* In other words, the plaintiff in *Krupski* did not know what she did not know; but Herrera *did* know what he did not know. *Id.*

Finally, *Herrera* said that the definition of "mistake" under Rule 15(c)(1)(C)(ii) does not extend to a John Doe scenario. *Id.* This is because *Krupski* did not treat "inadequate knowledge" and "mistake" as the same. *Id.* In short, because Herrera's amended complaint did not relate back to his original one, it was untimely. *Id.* at 499.

*Herrera* thus reaffirms the Seventh Circuit's rule that naming a John Doe defendant is not a mistake under Rule 15(c), and when a plaintiff attempts to add individual defendants after the statute of limitations has expired, it will be untimely. That's the precise issue here. Under *Herrera* and its antecedents, the Estate's addition of the five officers in its second amended complaint [Dkt. 25] does not relate back to its original complaint

where it named the John Doe officers.[10] [Dkt. 1-3] Consequently, the Estate's Fourth Amendment claims against the officers are untimely and fail as a matter of law.

### A. The Estate knew the officers' identities since January 2020, but failed to name them in its initial complaint it filed a year later in January 2021.

And if this were not enough, the Estate's federal claims against the officers fail for another—more basic—reason: the Estate's counsel *knew* the individual officers' identities for *more than a year* before the statute of limitations expired. *See* [Dkt. 74-16 at 1]. Indeed, the Defendants' counsel and the Estate's counsel had communicated via email when the Defendants' counsel explicitly informed the Estate's counsel of the names of the individual officers involved in the incident at the church and told him exactly who to sue. *Id.*

For whatever reason, the Estate did not do so when it filed suit three weeks later. *See* [Dkt. 1-3 at 1]. Nor did it do so before the statute of limitations lapsed over a year after. Therefore, the Estate had no "lack of knowledge" of the officers' identities.

Caselaw from around the country confirms what all lawyers learned in law school: if a plaintiff knows of a defendant responsible for her damages, she must timely sue him.[11] To do otherwise is a deliberate choice and not a mistake. Any Section 1983 claim against the officers fails on this basis alone.

---

[10] The United States Supreme Court denied Herrera's petition for a writ of certiorari to review the Seventh Circuit's decision on March 28, 2022. See *Herrera v. Cleveland*, --- S. Ct. ---, 2022 WL 892109 (Mar. 28, 2022).

[11] See generally *Garvin v. City of Philadelphia*, 354 F.3d 215, 221-22 (3d. Cir. 2003) ("Of course, an amended complaint will not relate back if the plaintiff had been aware of the identity of the newly named parties when she filed her original complaint and simply chose not to sue them at that time."); *Barrow v. Wethersfield Police Dep't.*, 66 F.3d 466, 470 (2d Cir. 1995) ("[T]he failure to identify individual defendants when the plaintiff knows

**3. Even if the Estate's claims against the officers somehow relate back under Rule 15, the Estate cannot show that each officer had sufficient personal involvement to be held liable for any constitutional deprivation.**

"Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017); see also *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must [show] that each Governmental-official defendant, though the individual's own actions, has violated the Constitution.").

The Estate has sued all five officers who helped detain and subdue Northington. But the Estate cannot put forward sufficient evidence to establish that *each officer*—Jackson, Hyde, Haley, Monday, and Cooper—violated her Fourth Amendment rights.

"The mere presence of an officer at the scene, without more, does not by some mysterious alchemy render him responsible under Section 1983 for [his actions or] the actions of a fellow officer. *Echavarria v. Roach*, 2021 WL 4480771, at *13 (D. Mass. Sept. 30, 2021). See also *Burley v. Gagacki*, 729 F.3d 610 (6th Cir. 2013) ("To establish liability against an individual defendant acting under color of state law, a plaintiff must show that the

---

that such defendants must be named cannot be characterized as a mistake."); *Schoolcraft v. City of New York*, 81 F. Supp. 3d 295, 301 (S.D.N.Y. 2015) (same); *Powers v. Graff*, 148 F.3d 1223, 1227 (11th Cir. 1998) ("[E]ven the most liberal interpretation of 'mistake' cannot include a deliberate decision not to sue a party whose identity plaintiff knew from the outset. Nothing in the Rule or in the [advisory committee] [n]otes indicates that [relation back] applies to a plaintiff who was fully aware of the potential defendant's identity but not of its responsibility for the harm alleged."); *Hodge v. Orlando Utils. Comm'n*, 2009 WL 5067758, at * 6 (M.D. Fla. Dec. 15, 2009) ("amended compliant cannot relate back to the initial compliant where the plaintiff knew the identity of the newly-named party at the time the initial complaint was filed and deliberately chose not to sue that party in the initial complaint."); and *Hardesty v. Sacramento Metro. Air Quality Mgmt. Dist.*, 935 F. Supp. 2d 968, 981 (E.D. Cal. 2013) (same) (citing cases).

defendant was personally involved in the use of excessive force."); *Jutrowski v. Twp. Of Riverdale*, 904 F.3d 280, 291 (3d Cir. 2018) (same).

Unsurprisingly, different officers played different roles. Officer Monday simply helped move Northington from the pews to the center aisle. [Dkt. 74-11] And Officer Jackson's involvement was limited to getting Northington detained in handcuffs when officers arrived. [Dkts. 74-5 at 53 (Jackson Dep. 53:9-12); 74-10] So too with Officer Haley. [Dkt. 74-8] To this extent, the officers—especially but not exclusively Monday, Jackson, and Haley—are entitled to summary judgment. Cf. *Iqbal*, 556 U.S. at 676.

### 4. The officers are entitled to qualified immunity.

A defendant is protected by qualified immunity unless the plaintiff shows: "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," *Malley v. Briggs*, 106 S. Ct. 1092, 1096 (1986), and it protects the officers here from the Estate's Fourth Amendment claims.

### A. The officers committed no constitutional violation.

The Estate brought Fourth Amendment excessive-force claims against the officers. But the claims fail because the officers did not use excessive force. A claim for excessive force under § 1983 invokes the Fourth Amendment's protection against unreasonable seizures. *Stainback v. Dixon*, 569 F.3d 771, 767 (7th Cir. 2009). The reasonableness standard is objective, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

The *Graham* standard considers whether each use of force was reasonable under the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [s]he is actively resisting arrest or attempting to evade arrest by flight." *Id.* "If the suspect is mentally ill, the officer's awareness of h[er] mental illness is also a factor." *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010).

"[T]he [C]ourt's ultimate goal in examining these factors is to determine whether the force used to seize the suspect was excessive in relation to the danger [s]he posed if left unattended." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (cleaned up). Here, it is not readily apparent what use of force the Estate contends was unreasonable. But it suffices to say that no officer violated Northington's Fourth Amendment rights.[12]

### i.   Officers had probable cause to detain Northington.

The officers need not re-hash the undisputed evidence. Northington desperately needed help. All the officers acted with that goal in mind. [Dkts. 74-7; 74-8; 74-9; 74-10; 74-11] But they needed to get her under control first.

The officers, without question, had probable cause to do an immediate detention of Northington, and the Estate cannot seriously argue otherwise. *See generally* IND. CODE

---

[12] Consistent with Circuit caselaw, the Defendants "carve up the incident into segments and judge each on its own terms to see if the officers were reasonable at each stage." *Deering v. Reich*, 183 F.3d 645, 652 (7th Cir. 1999). Analyzing each discrete use of force is the only way the Court can properly determine "the reasonableness of the force used...*at the time the force [was] applied.*" *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013) (emphasis added). Each use of force by the officers was indeed objectively reasonable.

§ 12-26-4-1 *et seq.* (permitting police officers to immediately detain individuals who officers believe have a mental illness; dangerous or gravely disabled; and in immediate need of hospitalization or treatment); *Bruce v. Guernsey*, 777 F.3d 872, 876 (7th Cir. 2015) ("[A] mental-health seizure is lawful if there is probable cause to believe that the person is a danger to herself or others."); *Fitzgerald v. Santoro*, 707 F.3d 725, 732 (7th Cir. 2013) (same).

### ii.    It was objectively reasonable for officers to detain Northington in handcuffs.

With the lawful power to detain Northington came the legal power to use reasonable force to accomplish that detention. *Graham*, 490 U.S. at 396 ("[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). That principle applies to protective detention as well. *Bruce*, 777 F.3d at 875 ("The Fourth Amendment…governs mental-health seizures."); *Turner v. City of Champaign*, 979 F.3d 563, 568 (7th Cir. 2020) (same).

Detaining Northington in *three* sets of handcuffs was not constitutionally problematic—especially under the circumstances. Cf. *Day v. Wooten*, 947 F.3d 453, 458 n. 4 (7th Cir. 2020) ("Adding a second pair of handcuffs, by attaching one to each wrist and connecting them in the middle, is a method used on larger arrestees to make the arrestee more comfortable by lessening the restrictiveness of the handcuffs."), *reh'g denied, cert. denied*. Indeed, federal courts have long condoned the reasonable use of handcuffs for detention during searches and seizures. See *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (searches); *Graham*, 490 U.S. at 396 (seizures for arrests); *Turner*, 979 F.3d at 570 (mental-health seizures).

As a corollary, "[t]here is no general constitutional right for an arrestee to be free of handcuffs." *Robbins v. Lappin*, 170 Fed. Appx. 962, 964 (7th Cir. 2006); *Soares v. State of Conn.*, 8 F.3d 917, 922 (2d Cir. 1993) (same). And the Defendants are unaware of any caselaw suggesting that handcuffs cannot be used during a civil or mental-health seizure.

Nor is there any evidence that Northington complained that the handcuffs were too tight or requested that their positioning be modified. Compare *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003); *Stainback*, 569 F.3d 767. In short, officers' use of three sets of hand-cuffs behind Northington's back to detain her was objectively reasonable.

### iii.   The officers' uses of force when Northington flailed around and kicked on the floor were reasonable too.

Undisputed evidence confirms that while officers moved her to the floor, and after being placed there, Northington continued to actively resist, kick, spit, thrash, flail, and tried to get up and roll over. *See* [Dkts. 74-2 at 11; 17-18 (Cooper Dep. 11:3-5; 17:17-18:14); 74-3 at 22; 26-28; 38-40 (Haley Dep. 22:8-17; 26:15-21; 28:2-11; 38:22-39:14; 40:4-8); 74-5 at 52-54 (Jackson Dep. 52:21-23; 53:22-54:1); 74-6 at 12;13; 17; 21 (Monday Dep. 12:6-13:4; 17:10-15; 21:4-8)]. This occurred up until Northington had breathing issues, which was about two minutes later. [Dkt. 74-2 at 21 (Cooper Dep. 21:7-9); 74-3 at 40-41 (Haley Dep. 40:18-41:4); 74-4 at 23 (Hyde Dep. 23:15-25); 74-5 at 53-54 (Jackson Dep. 53:22-54:4); 74-6 at 17 (Monday Dep. 17:16-21)] Maybe even less than that. [*Id.*]

When police conduct a "civil seizure for an individual's self-protection," and she begins "actively resisting[,]" officers may control her.[13] *Fitzgerald*, 707 F.3d at 734 (cleaned up). In fact, "unlike when someone is passively refusing to move or follow lawful commands, the police may use significant force to subdue someone who is actively resisting lawful detention." *Turner*, 979 F.3d at 569. So too here.

For example, officers may "h[o]ld [the resisting person's] arm and wrist in a firm manner[,]" place her on a gurney, and apply handcuffs or straps to hold her down. *Id.* Relevant here, they may also place her into "a prone position with his hands and legs restrained because of the need to incapacitate h[er] and to protect the safety of the officers when the person is resisting[.]" *Est. of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (cleaned up), *reh'g denied*; see also *Castillo v. City of Round Rock,* 177 F.3d 977 (5th Cir. 1999) (same); and *Ryan v. Armstrong*, 850 F.3d 419, 427-28 (8th Cir. 2017) (same), *reh'g denied*.[14]

"When police officers face what is essentially a fluid situation, they are entitled to graduate their response to meet the demands of the circumstances confronting them." *Smith v. Ball State Univ.,* 295 F.3d 763, 770 (7th Cir. 2002). This is precisely what the officers

---

[13] Officer Haley confirmed that officers have an interest in subduing a person who actively resists. *See* [Dkt. 74-3 at 40 (Haley Dep. 40:9-13)].

[14] This technique "cannot be characterized, in itself, as 'deadly' force" and can be "objectively reasonable under the circumstances." *Id.* at 593-94. Compare *Mullenix v. Luna,* 136 S. Ct. 305, 312 (2015) (per curiam) ("It does not assist analysis to refer to all use of force that happens to kill the arrestee as the application of deadly force.") (Scalia, J., concurring).

did with Northington: they knew they were conducting an immediate detention (or mental-health seizure); and they needed to get her under control so she could be transported to the hospital without compromising her, their, or the medics' safety.

Therefore, "[r]estraining a person, [who is experiencing a mental health crisis,] in a prone position is not, in and of itself, excessive force when the person restrained is resisting[.]" *Phillips* at 123 F.3d at 593; *see also Turner*, 979 F.3d at 570 (permitting officers to place arrestee having mental crisis in prone position); *Thompson v. City of Indianapolis*, Case No. 1:15-cv-01217-TWP-DML, 2017 WL 4365967, at *10-11 (S.D. Ind. Sept. 29, 2017) (granting summary judgment on estate's excessive-force claim where decedent, who actively and violently resisted, was placed in prone position before and after being restrained in handcuffs). Accordingly, the officers' decision to place Northington in a prone position on the floor in the center aisle of the church—given the undisputed evidence— was not constitutionally problematic.

Additionally, when a prone detainee is kicking, officers may respond to the "escalating situation" by restraining her legs "given the peril posed by h[er] continued kicking." *Phillips*, 123 F.3d at 593. Thus, Officer Hyde's decision to restrain and secure Northington's legs with his hands and legs to prevent her from kicking was objectively reasonable. [Dkts. 74-2 at 19 (Cooper Dep. 19:9-13); 74-4 at 17-18 (Hyde Dep. 17:1-18:23); 74-6 at 15 (Monday Dep. 15:15-22)]. Cf. *Turner*, 979 F.3d at 570 (permitting officers to use a hobble on detainee's kicking legs after officer's use of hands and knees to restrain his legs failed).

As to the use of an officer's knee, "[t]he reasonableness of kneeling on a prone individual's back during an arrest turns, at least in part, on how much force is applied.

Kneeling with just enough force to prevent an individual from 'squirming' or escaping might be eminently reasonable, while dropping down on an individual or applying one's full weight (particularly if one is heavy) could actually cause death." *Abdullahi v. City of Madison*, 423 F.3d 763, 771 (7th Cir. 2005).[15] For this reason, federal courts have also permitted police officers to use their knees on arrestees when circumstances warrant that force.[16]

Here, a 160-pound Officer Cooper placed his knee on Northington's lower back for mere seconds to prevent her from rolling over; she was still kicking spitting, and trying to get up. [Dkts. 74-3 at 26; 38-39 (Haley Dep. 26:15-21; 38:22-39:14); 74-6 at 17 (Monday Dep. 17:10-15); 74-7at 2] Officer Haley saw this happen, and (for safe measure) immediately instructed Cooper to remove his knee from Northington's lower back, which Cooper did. [Dkts. 74-3 at 26-27; 31 (Haley Dep. 26:1-27:18; 31:2-5); 74-6 at 17 (Monday Dep. 17:2-9)]

---

[15] Thus, "*Abdullahi* stands for the rather unsurprising proposition that a knee-to-the-back restraint may or may not be reasonable depending on the circumstances." *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009).

[16] See *Turner*, 979 F.3d at 570 ("Placing a knee on Mr. Turner's shoulder was also not excessive given the undisputed evidence of his continued resistance on the ground."); *Catlin,* 574 F.3d at 366-68 (knee in arrestee's back while he resisted and struggled to break free was reasonable); *Phillips*, 123 F.3d at 593 (officer's knee placement on decedent's back during arrest with "just enough weight ... to keep him from rolling over and kicking" or getting up and posing "a danger to himself, the officers and" other responders); and *Giannetti v. City of Stillwater*, 216 Fed. Appx. 756, 766 (10th Cir. 2007) ("We conclude that the officers' continued use of force to restrain Ms. Giannetti [which included a knee in her back], although perhaps not the least intrusive choice that they could have made, was not unreasonable in response to her escalating opposition.").

Haley also testified that Cooper did not place all—or even a majority of—his weight on his knee. [Dkts. 74-3 at 39 (Haley Dep. 39:15-22); 74-8 at 2] This makes sense, since Northington's autopsy revealed no internal bruising or trauma to Northington's backside. [Dkt. 74-15 at 6]. In short, Officer Cooper's fleeting use of his knee on her lower back was reasonable under the circumstances.

### iv.   The Estate's claims cannot go to the jury without sufficient evidence of causation. No such evidence exists.

"[T]he mere fact that an injury occurred while an individual was in police custody is not sufficient to avoid summary judgment[.]" *Abdullahi*, 423 F.3d at 770. The Estate must produce evidence that "excessive force was the proximate cause of [the] injury[,]" meaning it "occurred as a result of the excessive force." *Clarett v. Roberts*, 657 F.3d 664, 673 (7th Cir. 2011). This the Estate cannot do.

Northington's cause of death was "Anoxic Brain Injury in the Setting of Morbid Obesity, Cardiac Hypertrophy, Schizophrenia, and Struggle with Others." [Dkt. 74-15 at 1] Aside from a few abrasions—which would be expected given her actions at the church—Northington had "[n]o evidence of significant traumatic injuries." [*Id.* at 2]

Further, her back and extremities were "without evidence of injury." [*Id.* at 6] Moreover, the autopsy report emphasized that Northington was involved with a struggle with others and this "could have contributed to her sudden cardiac death and resultant anoxic brain injury." [*Id.* at 3] (emphasis added). But the "precise contributions" of the struggle and her "natural conditions including morbid obesity, cardiac hypertrophy, and schizophrenia" to her death "cannot be determined." [*Id.*]

In essence, it was possible that Northington's struggle with officers—a highly aerobic and physical activity—contributed to her death. But "[t]he existence of a possible issue of fact does not, by itself, prevent summary judgment." *King v. Hendricks Cnty. Comm'rs*, 954 F.3d 981, 985 (7th Cir. 2020). And the Estate can designate no evidence to create any factual dispute on causation. Compare *Abdullahi*, 423 F.3d at 772 ("The conflicting conclusions of the medical experts must also be reconciled. But this is just another way of saying that there *is* a genuine issue of fact as to the excessive force claim, which must be sorted out by a jury.").[17] This is yet another reason summary judgment is appropriate on the excessive-force claims.

---

[17] As to any expert reports, the Estate failed to properly or timely disclose them under both this Court's Case Management Plan [Dkt. 29 at 3] and Fed. R. Civ. P. 26(a)(2). Instead, it filed a barebones "Expert Witness List" two days late. *Compare* [Dkt. 29 at 3] *with* [Dkt. 71]. Then on March 11, 2022—seventeen days after the Estate's expert-disclosure deadline, it e-mailed the undersigned counsel a *partial* expert disclosure and revealed that more would be coming soon. *See* [Dkt. 74-17]. For starters, email is not proper service under the Federal Rules because the undersigned counsel never consented in writing to receiving service of discovery papers by email. *See* Fed. R. Civ. P. 5(b)(2)(E); *Cox v. Sherman Cap. LLC*, 2013 WL 2432148, at *1 (S.D. Ind. June 4, 2013); *Dedmon v. Continental Airlines, Inc.*, 2015 WL 1040521, at * 4 (D. Colo. Mar. 6, 2015). So the expert disclosures were never properly served under the Federal Rules. But more importantly, "[i]n accordance with the terms of Federal Rule of Civil Procedure 37(c)(1) and [Seventh] [C]ircuit precedent[ ], when a party fails to timely disclose an expert witness and/or produce the report of his opinions as required by Rule 26(a), the exclusion of the witness's proposed testimony is automatic and mandatory, unless the proponent can show that the violation of Rule 26(a) was either justified or harmless." *Est. of Green v. City of Indianapolis*, 854 Fed. Appx. 740, 744 (7th Cir. 2021). The violation was, and the Estate can show, neither.

### B.  The officers did not violate clearly established law.

Even if the Court finds a constitutional violation as to any officer, Northington's rights were not clearly established. No caselaw put the officers on notice that their February 2019 conduct violated her clearly established Fourth Amendment rights. *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam).

The Supreme Court has emphasized—again, and again, and again—that qualified immunity is even more important, and thus generally appropriate, in the Fourth Amendment context.[18] Nor is this the rare, "obvious case" where the unlawfulness of the officers' conduct is sufficiently clear even though existing precedent does not address similar circumstances. *Brosseau*, 125 S. Ct. at 599. All officers therefore possess qualified immunity on all the Estate's claims.

### 5.  Any state-law claims against the individual officers fail.

The Estate has lodged a state-law battery claim against the individual officers. [Dkt. 25 at 4-5]. But the Indiana Tort Claims Act bars plaintiffs from suing government employees if they acted within the course and scope of employment. *Miner v. Sw. Sch. Corp*, 755 N.E.2d 1110, 1115 (Ind. Ct. App. 2001); see IND. CODE § 34-13-3-5(B).

---

[18] See generally *Rivas-Villegas v. Cortesluna*, 142 S. Ct. 4 (2021) (per curiam); *City of Tahlequah v. Bond*, 142 S. Ct. 9 (2021) (per curiam); *City of Escondido v. Emmons*, 139 S. Ct. 500 (2019) (per curiam); *Dist. of Columbia v. Wesby*, 138 S. Ct. 577 (2018) *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curiam); *White v. Pauly*, 137 S. Ct. 548 (2017) (per curiam); *Mullenex*, 136 S. Ct. 305; *City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015); *Carroll v. Carman*, 135 S. Ct. 348 (2014) (per curiam) *Plumhoff v. Rickard*, 134 S. Ct. 2012 (2014); *Brosseau v. Haugen*, 125 S. Ct. 596 (2004) (per curiam); *Stanton v. Sims*, 134 S. Ct. 3 (2013) (per curiam); *Reichle v. Howards*, 132 S. Ct. 2088 (2012) *Wilson v. Layne*, 119 S. Ct. 1692 (1999); *Hunter v. Bryant*, 112 S. Ct. 534 (1991) (per curiam); and *Malley*, 106 S. Ct. 1092.

That is the case here: all officers indeed acted within the course and scope of their employment with the City of Indianapolis. [Dkts. 74-7 at 1; 74-8 at 1; 74-9 at 1; 74-10 at 1; 74-11 at 1] Compare *Day v. City of Indianapolis*, 380 F. Supp. 3d 812, 828 (S.D. Ind. 2019) (Pratt, J.) (granting summary judgment to individual police officers on state-law claims brought against them because of same ITCA provision), *rev'd on other grounds by Day*, 947 F.3d 453. Therefore, any claims against them are non-starters.

6. **The City of Indianapolis is entitled to summary judgment on the state-law battery claim under Indiana's use-of-force immunity statute.**

In 2019, Indiana's General Assembly passed a law which provides immunity from civil liability relating to use of force employed under certain circumstances. *See generally* IND. CODE § 34-30-31-1 *et seq.* In particular, when a "forcible felony" is being committed, an individual is justified in using force against the person committing the forcible felony. *Id.* A forcible felony is "a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being." IND. CODE § 35-31.5-2-138.

That an individual was not prosecuted for a crime relating to his use of force creates a rebuttable presumption that the use of force is justified. *See* IND. CODE § 34-30-31-1(e). And the justified use of force "provides a *complete* immunity against any claim or action initiated by a person who alleges to have been injured or damaged by the force or whose conduct justified the use of force." IND. CODE § 34-30-31-1(b) (emphasis added). Indeed, when the use of force is justified—i.e., when an individual is not criminally

charged for his conduct—"no claim or action for damages" can be brought against that individual or his employer. IND. CODE § 34-30-31-1(b).

Here, no officer was criminally charged for any use of force relating to the incident. [Dkts. 74-7 at 2; 74-8 at 3; 74-9 at 2; 74-10 at 2; 74-11 at 2] In fact, IMPD did not even initiate an SIU investigation. [Dkt. 74-7 at 2] Nor is there any serious debate that her actions of physically assaulting both parishioners and police officers alike were forcible felonies. *See* IND. CODE § 35-31.5-2-138 (defining forcible felony as "a felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being.").

Indeed, three officers actually sustained injuries. [Dkts. 74-2 at 10 (Cooper Dep. 10:3-6); 74-3 at 13 (Haley Dep. 13:1-10); 74-5 at 19-20 (Jackson Dep. 19:1-20:1); 74-7 at 1-2; 74-8 at 2] So too with some unlucky parishioners. [Dkts. 74-1 at 45 (Montgomery Dep. 45:19-23); 74-5 at 49 (Jackson Dep. 49:18-23); 74-8 at 2; 74-10 at 1] Thus, under this statute, the City is immune from the Estate's battery claim.

### 7. Even if the City is not immune under the use-of-force immunity, the battery claim still fails.

Indiana law requires police officers to use only reasonable and necessary force in making an arrest. *Bowden v. Town of Speedway, Ind.*, 539 F. Supp. 2d 1092, 1110 (S.D. Ind. 2008). If an officer uses excessive or unnecessary force, he may commit the tort of battery. *Id.* Indiana's excessive-force standard parallels the Fourth Amendment standard. *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. Ct. App. 2000).

Even if the City is not immune under the use-of-force immunity, it still cannot be liable for battery for the same reason that the officers could not be liable under the Fourth Amendment: they used no excessive or unnecessary force to detain or try to subdue Northington. The officers' conduct was objectively reasonable. See *supra* at pp. 2-13; 21-28.

## Conclusion

The Court should grant summary judgment to the Defendants on all claims for the reasons discussed above.

Respectfully submitted,

OFFICE OF CORPORATION COUNSEL

*/s/ Adam S. Willfond*
Adam S. Willfond (31565-49)
Deputy Chief Litigation Counsel
200 E. Washington Street, Suite 1601
Indianapolis, IN 46204
317.327.4055
adam.willfond@indy.gov