**171 SE 14th Street**
**Pompano Beach, FL 33060**

**Robert R. Pusins & Associates, Inc.**
*Police Practices & Procedures Experts*

**954-303-2169**
**robertpusins@att.net**

April 4, 2022

Larry Pleasants, Esq.

Larry Pleasants Attorney at Law

7508 Madison Ave

Indianapolis, Indiana 46227

RE:    United States District Court

Southern District of Indiana

Indianapolis Division

Case: No. 1:21-cv-00406-TWP-TAB

The Estate of Eleanor Northington,

Plaintiff,

v.

The City of Indianapolis,

Officer Bruce Jackson,

Officer Robert Haley, Jr.,

Officer Lane Cooper,

Officer Ronald Monday,

Officer Justin Hyde,

And Mt. Calvary Apostolic Church, Inc.,

Defendants

1

Dear Mr. Pleasants:

I have been retained by the law firm of Larry Pleasants, Attorney at Law, in my capacity as an expert on police practices and procedures and the use of force[1]. I was tasked to analyze the conduct of the defendants, including Indianapolis Metropolitan Police Department's (IMPD) Officer Bruce Jackson (Jackson), Officer Robert Haley, Jr. (Haley), Officer Lane Cooper (Cooper), Officer Ronald Monday (Monday), and Officer Justin Hyde (Hyde), involving Eleanor Northington (Northington), and to offer opinions and conclusions as to whether the conduct and the force used was appropriate and reasonable under the totality of circumstances and in compliance with widely accepted practices regarding the use of force, positional asphyxia and excited delirium.

As background to my expert witness qualifications, I began my 35-year active-duty career in law enforcement in 1974 with the Fort Lauderdale Police Department (FL). I served Fort Lauderdale as a police officer, a field training officer, detective, sergeant, captain, district commander, major, and assistant chief. I retired in 2004 with over 30-years of law enforcement experience.

In 2013, I joined the Broward County Sheriff's Office as a member of the Sheriff's Executive Command Staff with the rank of Executive Director and served in that capacity for over 5-years before leaving the agency in 2018.

During my 35-year career in law enforcement, I have had to review hundreds of internal investigations including those involving the use of force. I have supervised hundreds of officers and have had to review their compliance with standards relating to police conduct and investigations as both a supervisor and later in command and executive management positions. I have reviewed and evaluated the thoroughness of hundreds of such investigations.

---

[1] My curriculum vitae is attached, including my qualifications, a list of publications within the previous 10 years, and a list of testimony over the past four years. My compensation is $400.00 per hour.

Over my career, I have had extensive law enforcement management, administrative, investigative, and operational experience, supplemented by practical, and formal education, and specialized training. I have received thousands of hours of specialized and professional training in nearly all areas of law enforcement including particular emphasis in the area of investigations, use of force, police liability, and policies and procedures. I have been involved and responsible for the development and updating of police policies and procedures for over 20-years during my law enforcement career.

I received a Bachelor of Arts degree from the University of South Florida in Tampa, Florida. I am a graduate of the FBI National Academy in Quantico, Virginia, and a graduate of the University of Louisville's Southern Police Institute Command Officers Development Course. I am a certified Force Science Analyst from the Force Science Institute of the University of Minnesota. I was also awarded "life member" status with the International Association of Chiefs of Police (IACP).

I have been consulting as an expert in the field of law enforcement since 1997 and have been retained as an expert in civil and criminal cases in thirty-one states, the District of Columbia, and in Canada. I have been qualified as an expert in the use of force by state and federal courts and have never been excluded or prohibited to testify in any civil or criminal case as an expert.

A copy of my Curriculum Vitae is attached to this report. My Rule 26 Disclosure, documenting my testimony over the past 4-years in deposition or trial, as well as my publications over the past 10-years, is also attached to this report.

**I.    Factual background as taken from the Complaint, in part,:**

1. *On February 7, 2019 Ms. Eleanor Northington, was attending a church service with her daughters, son, and son-in-law at Mt. Calvary Apostolic Church;*
2. *Ms. Northington's youngest daughter is under the age of majority;*
3. *Ms. Northington's son is under the age of majority;*

4. *Ms. Eleanor Northington had long suffered from mental illness;*

5. *Ms. Eleanor Northington was massively obese;*

6. *At some point during the service, Ms. Northington suffered a psychotic episode;*

7. *Ms. Northington began to act belligerently towards members of the choir and towards the Church Pastor;*

8. *Ms. Northington left the sanctuary area of Mt. Calvary and removed her clothes;*

9. *At some point, Ms. Northington appeared in the sanctuary area in a state of undress;*

10. *Ms. Northington put her clothes back on but continued to act belligerently swearing at and spitting on congregants and church staff;*

11. *At some point, Ms. Northington was restrained by members of the church;*

12. *One congregant called the police;*

13. *At some point, a cloth was placed over Ms. Northington's mouth;*

14. *IMPD Officers Officer Bruce Jackson IMPD#J8560; Officer Robert Haley Jr., IMPD#33140; Officer Lane Cooper IMPD#41341; Officer Ronald Monday IMPD#41948; and Officer Justin Hyde IMPD#40829 arrived with additional back-up of approximately 25 additional officers;*

15. *One or more of the following officers, Officer Bruce Jackson IMPD#J8560; Officer Robert Haley Jr., IMPD#33140; Officer Lane Cooper IMPD#41341; Officer Ronald Monday IMPD#41948; or Officer Justin Hyde IMPD#40829, restrained Ms. Northington in handcuffs, behind her back;*

16. *One or more of the following officers, Officer Bruce Jackson IMPD#J8560; Officer Robert Haley Jr., IMPD#33140; Officer Lane Cooper IMPD#41341; Officer Ronald Monday IMPD#41948; or Officer Justin Hyde IMPD#40829, wrestled Ms. Northington to the ground on her stomach;*

17. *Upon information and belief, one or more of the following officers, Officer Bruce Jackson IMPD#J8560; Officer Robert Haley Jr., IMPD#33140; Officer Lane Cooper IMPD#41341; Officer Ronald Monday IMPD#41948; or Officer Justin*

Hyde IMPD#40829, "placed a knee" on Ms. Northington's back while she was handcuffed face down;

18. The floor of Mt. Calvary church is covered in shag carpeting;"
19. Ms. Northington audibly told the officers she could not breathe;
20. IMPD officers ignored Ms. Northington's cry about not being able to breathe;
21. Ms. Northington was unable to breathe and suffocated to death in the old shag carpeting;
22. IMPD officers use of excessive force, placing handcuffs, wrestling Ms. Northington to the ground on her stomach, "placing a knee in her back," caused Ms. Northington's death;
23. Ms. Northington's minor son witnessed his Mother's traumatic death;
24. The IMPD Officers who had direct contact with Ms. Northington are Officer Bruce Jackson IMPD#J8560; Officer Robert Haley Jr., IMPD#33140; Officer Lane Cooper IMPD#41341; Officer Ronald Monday IMPD#41948; and Officer Justin Hyde IMPD#40829;

## II. Methodology

In pursuing my analysis, I reviewed the following documents and materials relating to the referenced case:

1. Second Amended Complaint (5 pages)
2. Marion County Coroner's Office, Autopsy Report, MC-19-0335 (15 pages)
3. Death Certificate (1 Page)
4. IMPD Internal Affairs Investigative Report, 2019-0011 (11 pages)
5. IMPD General Order 1.1, Law Enforcement Role and Authority, 10/27/15 (3 pages)
6. IMPD General Order 1.7 Critical Incident Response Team (CIRT), 9/18/12 (4 pages)
7. IMPD General Order 1.10, Search and Seizure, 10/27/15 (4 pages)
8. IMPD General Order 1.12 Use of Discretion, 7/29/15 (2 pages)
9. IMPD General Order 1.31 Use of Force – Investigation and Reporting, 8/10/16 (10 pages)
10. IMPD General Order 4.7, Mental Writs/Immediate Detentions, 12/17/15 (6 pages)

11. IMPD General Order 8.1, Prison Handling, Transportation and Escape, 4/22/15 (9 pages)
12. IMPD General Order 9.13, Officers Assaulted, 1/1/07, (2 pages)
13. Indianapolis EMS Patient Report # 1F900016729, Eleanor Northington (12 pages)
14. Transcript of February 2, 2019, statement of Pastor Grady Rogers (15 pages)
15. Transcript of February 6, 2019, statement of Jesse Russell (23 pages)
16. Transcript of February 6, 2019, statement of Janena Journey (10 pages)
17. Transcript of February 13, 2019, statement of Justin Hyde (7 pages)
18. Transcript of September 23, 2021, deposition of Justin Hyde (32 pages)
19. Transcript of February 13, 2019, statement of Bruce Jackson (15 pages)
20. Transcript of September 21, 2021, deposition of Bruce Jackson (54 pages)
21. Transcript of February 13, 2019, statement of Robert Haley (10 pages)
22. Transcript of September 21, 2021, deposition of Robert Haley, Jr.(42 pages)
23. Transcript of February 13, 2019, statement of Lane Cooper (9 pages)
24. Transcript of September 21, 2021, deposition of Lane Cooper (25 pages)
25. Transcript of February 13, 2019, statement of Ronald Monday (8 pages)
26. Transcript of September 23, 2021, deposition of Ronald Monday (25 pages)

In the presentation of my opinions and conclusions, I relied upon and used the case materials identified above. I reached my opinions and conclusions by applying my specialized knowledge, skills, training, education, and experience obtained over 35 years in law enforcement to the analysis and evaluation of the facts and information given to me. My opinions are provided with a reasonable degree of professional probability within the field of law enforcement and are intended to assist the trier of fact to understand the evidence and/or to determine a fact issue.

This report may include the use of terminology that overlap with other accepted legal terms or standards. My use of specific legal terms, or standards are not intended to draw legal conclusions or to subvert the function of the court or to inappropriately influence triers-of-facts. Specific legal terms are commonly used in the field of law enforcement and it is in that context that I use those terms when discussing law enforcement issues with both law enforcement practitioners and civilian audiences when offering expert opinions.

### III.    Relevant Law Enforcement Guidance

I used publications from the International Association of Chiefs of Police (IACP)[2], the Police Executive Research Forum (PERF)[3], and as further objective guidance in determining whether the actions of the officers were reasonable and consistent with widely accepted police practices and customs.

The IACP is a professional law enforcement association and for more than 120 years, the IACP has been launching internationally acclaimed programs, speaking on behalf of law enforcement, conducting groundbreaking research, and providing exemplary programs and services to members around the globe. Today, the IACP continues to be recognized as a leader in these areas. The IACP, through their National Law Enforcement Policy Center (Center), has been identifying leading practices and providing sound guidance for law enforcement agencies for over 30 years by addressing cutting edge issues confronting law enforcement through advocacy, programs, research, training, and other professional services.

The Center publishes Model Policies and Concepts and Issues Papers to provide guidelines, essential background material and supporting documentation to law enforcement agencies and officers, to provide greater understanding of the developmental philosophy and implementation requirements for the model policies. Reasonable law enforcement agencies and officers recognize that the Center makes every effort to ensure these papers and model policies incorporate the most current information and contemporary professional judgment on this issue.

---

[2] TheIACP.org
[3] Police Executive Research Forum, www.policeforum.org

The Center published a *National Consensus Policy and Discussion Paper on the Use of Force*[4]; Excited Delirium[5]; and *Arrests*[6]. I referred to and considered these documents during my analysis of this case.

The Center also published *Training Key #646 Investigative Detentions: Part I*[7] and I referred to and considered this document during my analysis of this case.

PERF, founded in 1976 as a nonprofit organization, is a police research and policy organization and a provider of management services, technical assistance, and executive level education to support law enforcement agencies. PERF helps improve the delivery of police services through the exercise of strong national leadership; public debate of police and criminal justice issues; and research and policy development.

PERF published the *Guiding Principles on the Use of Force*[8] and I referred to and considered this publication during my analysis of this case.

I also considered the publications *Evaluating Police Uses of Force*[9] and *The Law and Best Practices of Successful Police Operations, Sixth Edition*[10] during my analysis of this case.

Reasonably prudent officers know and understand that the "objectively reasonable standard" is the legal standard used to determine the lawfulness of a use of force under the Fourth Amendment to the U.S. Constitution. The U.S. Supreme Court established this standard in its ruling in Graham v. Connor (490 - U.S. 386, 1989).

The examination of all instances of use of force, deadly or not, is to apply the facts and the totality of circumstances to the objectively reasonableness standard. Reasonably

---

[4] IACP *National Consensus Discussion Paper on Use of Force and Consensus Policy*, Revised July 2020 (originally Published October 2017)
[5] IACP Model Policy and Concepts and Issues Paper, *Excited Delirium*, April 2017
[6] IACP Model Policy and Concepts and Issues Paper, *Arrests*, August 2010
[7] IACP *Training Key #646 Investigative Detentions: Part I*
[8] PERF Guiding Principles on the Use of Force, March, 2016
[9] Evaluating Police Uses of Force, Seth W. Stoughton, Jeffrey J. Noble, Geoffrey P. Alpert, 2020
[10] The Law and Best Practices of Successful Police Operations, Sixth Edition, Jack Ryan, Attorney, 2021

prudent officers know and understand to only use force that is objectively reasonable under the totality of circumstances and to only use that level of force that any reasonable and prudent officer would use under the same or similar circumstances.

Such officers know that the use of force is to be judged from the perspective of a reasonable officer under the same circumstances without the benefit of hindsight; that officers are often required to make split-second decisions, in circumstances that are tense, uncertain, and rapidly evolving; and that force that is excessive, needless, and objectively unreasonable is a violation of the Fourth Amendment to the United States Constitution as well as established federal case law.[11]

The *National Consensus Policy and Discussion Paper on the Use of Force* states, in part:

1. It should be the foremost policy of all law enforcement agencies to value and preserve human life.
2. Defines "objectively reasonable" as the determination that the necessity for using force and the level of force used is based upon the officer's evaluation of the situation in light of the totality of the circumstances known to the officer at the time the force is used and upon what a reasonably prudent officer would use under the same or similar circumstances.
3. Defines "serious bodily injury" as an injury that involves a substantial risk of death, protracted an obvious disfigurement, or extended loss or impairment of the function of a body part or organ.
4. Use only the amount of force that is objectively reasonable to effectively bring an incident under control, while protecting the safety of the officer and others.
5. The decision to employ any use of force, including the use of firearms, may be considered excessive by law and agency policy or both, if it knowingly exceeded a degree of force that reasonably appeared necessary based on the specific situation.
6. While the Consensus Policy strives to prohibit excess of force, the reality is that excessive force can occur no matter how well-crafted the policy or extensive the

---

[11] Graham v. Connor, 490 U.C. 386, 396 (1989)

training. In these situations, it is crucial that other officers at the scene intervene to prevent or stop the use of excessive force. By requiring a pro-active approach to these situations and encouraging accountability for all officers on the scene, agencies can work towards preventing excessive uses of force.

7. When de-escalation techniques are not effective or appropriate, an officer may consider the use of less-lethal force to control a non-compliant or actively resistant individual. An officer is authorized to use agency-approved, less-lethal force techniques and issued equipment:

   1. to protect the officer or others from immediate physical harm,
   2. to restrain or subdue an individual who is actively resisting or evading arrest,
   3. to bring an unlawful situation safely and effectively under control.

Reasonably prudent officers know and understand that an important operational consideration is for officers to reevaluate the use of force throughout an incident and that what may be a reasonable force consideration at one point during an incident may become an unreasonable option as the incident de-escalates or if the officers or citizens surrounding the area are no longer in danger. Reasonable officers know that in order for a threat to be perceived as an immediate threat, it must be just that, an immediate threat and that if the threat has passed then the justification for using force has also passed.

Reasonably prudent officers know and understand that the review of force must carefully evaluate the individual facts and circumstances that were known to the officer at the moment of the use of force and consider the totality of circumstances. It is important to note that the review of force cannot view the actions of an officer with the luxury of 20/20 hindsight, but as an officer in the exact same situation in real time, while considering the severity of the crime at issue at the time the force was used; whether the subject posed an immediate physical threat to the safety of the officers or others, and the nature of that threat; and whether the subject is actively resisting or attempting to evade arrest by flight. Further, the inquiry must consider the level of resistance and the reasonableness of each application of force.

Reasonably prudent officers know and understand that an officer's perception that an imminent threat exists is reasonable when the officer has reason to believe that an individual has the ability, opportunity, and intent to cause harm. Officers must explain that the three aspects of threat – ability, opportunity, and intent, must be supported by specific, articulable observations, and not by conclusory statements that they feared for their safety or the safety of others. The existence of a bona fide threat must be predicated on an officer's articulation of details and circumstances that would lead a reasonable officer to conclude that the individual was physically capable of causing harm, was in a position to physically inflict that harm, and had manifested the apparent intent to do so. For a use of force to be considered constitutionally permissible, an officer must have an objectively reasonable belief that something *is happening*, not that something might *possibly happen*.

Reasonably prudent officers know and understand as stated by the IACP's Concepts and Issues Paper on *Excited Delirium*, in part,

- Individuals with ExDS (Excited Delirium Syndrome) may exhibit some or all of the following specific signs and characteristic symptoms:
    1. Extreme aggression or violence
    2. Constant or near constant physical activity
    3. Irresponsiveness to law enforcement presence
    4. Attraction to bright lights and/or loud sounds
    5. Nakedness or inadequate clothing
    6. Hyperthermia (increased body temperature)
    7. Rapid breathing
    8. Profuse sweating
    9. Unintelligible or animal like noises
    10. Insensitivity to or extreme tolerance of pain
    11. Excessive, seemingly superhuman strength
    12. Lack of fatigue despite heavy exertion
    13. Screaming and/or incoherent talk (I, D)

- Even though the theory of ExDS Deaths caused solely by positional asphyxia has been questioned, it is still recommended that restrained individuals be placed on their sides to aid in breathing and to defend against claims that positional asphyxia is the cause of death. (I, F)

- One key variable is to reduce the amount of time the individual struggles with officers and/or against restraints, because it is theorized that the longer a person resists the higher the risk of sudden death. (II, A)

- Once in custody, the individual should be restrained as appropriate to control kicking or standing. Officers should never attempt to control continued resistance by pinning the subject to the ground or against a solid object using body weight. Instead, officers should position the subject on his or her side to assist breathing and remove any unnecessary weight or compression to the chest, neck, or head. (II, A)

- While restrained, the individual's breathing status should be continuously monitored. (II, A)

- If the subject suddenly becomes calm and his or her breathing becomes shallow, it is an indication that he or she might be in jeopardy and requires immediate medical attention to avoid cardiac arrest. (II, A)

Reasonably prudent officers know and understand as stated by the IACP's Model Policy on *Excited Delirium*, in part,:

- When restrained, officers should position the subject in a manner that will assist breathing such as placement on his or her side to avoid pressure to the chest, neck or head.

- Officers should not attempt to control continued resistance or exertion by pinning the subject to the ground or against a solid object, using their body weight.

- Officers should check the subject's pulse and respiration on a continual basis until transferred to EMS personnel.

- Following a struggle, the subject should be showing normal signs of physical exertion such as heavy breathing. However, if the subject becomes calm and breathing is not labored during or after the application of restraints it might be an

indication that he or she is in jeopardy and requires immediate medical attention to avoid cardiac arrest. (IV, C, 6, 8, 9, 10)

Reasonably prudent officers know and understand as stated by the IACP's Concepts and Issues Paper on *Arrests,* in part,:

- Arrestees shall not be restrained in the four-point restraint unless the arrestee is uncontrollable by other means readily available. A four-point restraint is defined as the hands and ankles bound behind an individual's back. If a four-point restraint is deemed necessary, the arrestee shall be placed on his or her side once bound and monitored for potential physical problems such as difficulty in breathing. (IV, E, 2, c)

Reasonably prudent officers know and understand as stated by the IACP's Concepts and Issues Paper on *Arrests,* in part,:

- The arrestee should be restrained by use of handcuffs or other authorized devices after being taken into custody, except as otherwise provided by departmental policy. Other lawful forms of restraint should be used in order to ensure the safety of the arresting officers. (II, E)
- However, arrestees should not be restrained face-down in the four point restraint (that is, with hands and feet bound behind their back) unless the arrestee is violently resisting and is placed on his or her side to facilitate breathing. (II, E)
- Studies have indicated that when a suspect is faced down on his or her stomach, respiration is impaired and the result may be positional asphyxia - in effect, the suspect dies of suffocation. This potential is more likely in situations where the suspect is overweight, has exerted substantial energy in resisting arrest or in other ways prior to being restrained, and even more so if the suspect has ingested alcohol or drugs, or both, prior to the event. (II, E)

PERF's *Guiding Principles on Use of Force* states, in part,:

- Respect the sanctity of life by promptly rendering first aid. Officers should render first aid to subjects who have been injured as a result of police actions and should promptly request medical assistance. (Policy 7)

The Indianapolis Metropolitan Police Department's General Order 8.1, *Prisoner Handling, Transportation and Escape*, effective April 22, 2015, states, in part:

**Definitions** - Positional Asphyxia - a condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to a loss of consciousness or death.

### III. Positional Asphyxia

A. Officers must be aware of the warning signs that could result by positional asphyxia.

   A. A subject placed on their chest or stomach, with the legs and arms restrained behind the back may have difficulty breathing, leading to serious injury or death.

   1. Officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary regardless of the type of restraint used.

   2. The subject should be moved onto their side, allowing less interference with normal breathing as soon as possible.

   3. The subject should then be carefully observed and medical assistance should be summoned immediately to evaluate the subject's health.

   B. The signs listed below, especially high fever and shivering, may indicate a state of hypothermia resulting from excited delirium, a potentially dangerous condition. If a subject is suffering from any of the signs listed below and placed in a prone position that interferes with breathing there is a greatly increased risk of positional asphyxia.

   1. Bizarre, aggressive violent behavior outside the norm;

   2. Shouting and screaming, especially at inanimate objects;

   3. Violence towards objects, especially glass;

   4. Profuse sweating;

   5. High fever;

   6. Unexpected physical strength;

   7. Thrashing after resistant;

   8. Shivering;

   9. Dilated pupils;

10. Hallucinations;

11. Paranoia;

12. Tightness or pain in the chest;

13. Nausea;

14. Shortness of breath, and/or;

15. Known drug overdose.

C. Any detained subject exhibiting some or all of the above system symptoms must be closely monitored, especially if maximal restraint is used. Officers must make sure the subject is alert, conscious and can sit and speak on their own before transporting.

NOTE – Obese subjects are more at risk for positional asphyxiation, but death can result from anyone being improperly restrained.

## IV. Relevant IMPD Training On Positional Asphyxia and Excited Delirium, in part:

**Detective Bruce Jackson**

Jackson testified in his February 13, 2019, Internal Affairs statement:

- He was assigned to the Behavioral Health Unit as a Behavioral Health Officer for IMPD. (2, 3, 10)
- He was aware of the dangers of positional asphyxiation. (9)
- He had received departmental training on excited delirium. (12)

Jackson testified in his September 21, 2021, deposition:

- He was a behavioral health specialist with IMPD. (7:3-4)
- He was trained as a crisis intervention team (CIT) member in 2004. (8:17-18)
- He was in the position of a behavioral health specialist for three years prior to the subject incident. (10:6-8)
- He was familiar with the term positional asphyxia and with Police General Order 8.1 on Prisoner Handling, Transportation and Escape. (11:12-19)

- He had been trained not to apply a knee to the neck area when a person is being detained and not to the back, as long as it is not there for long periods of time. (38:21 – 39: 2)

**Officer Robert Haley**

Haley testified in his February 13, 2019, Internal Affairs statement:

- He had received departmental training on the dangers of positional asphyxia and was cognizant of those dangers during this incident. (6)
- He was familiar with excited delirium and characterized Northington's behavior to be consistent with excited delirium. (6)
- He was familiar with the incident involving NYPD where a person stopped breathing. (Eric Gardner) (9)

Haley testified in his September 21, 2021, deposition:

- He was aware of and had studied Police General Order 8.1 on Prisoner Handling, Transportation and Escape prior to February 6, 2019. (6:4-16)
- He was familiar with the term positional asphyxia and knew what it meant in in February 2019. (6:19-25)
- He was familiar with the term excited delirium and had received training on excited delirium, (8:2 – 15)

**Officer Lane Cooper**

Cooper testified in his February 13, 2019, Internal Affairs statement:

- He was aware of the dangers of positional asphyxia from departmental training. (6)
- He had received departmental training on excited delirium. (6)

Cooper testified in his February 21, 2019, deposition:

- He was familiar with the term excited delirium through the department's General Order and through his training at the IMPD Academy; he was familiar with the term positional asphyxia. (5:3-11)

**Officer Ronald Monday**

Monday testified in his February 13, 2019, Internal Affairs statement:

- He was trained on the dangers of positional asphyxia from departmental training and was cognizant of those dangers during this incident. (6)
- He was familiar with excited delirium. (6)

Monday testified in his February 23, 2019, deposition:

- He had heard of positional asphyxia during his training and was able to define positional asphyxia. (5:14-23)
- He received training on positional asphyxia in the police academy. (6:4-6)
- He was aware of the term excited delirium had heard of positional asphyxia during his training and was able to define excited delirium. (8:9-22)

**Officer Justin Hyde**

Hyde testified in his February 13, 2019, Internal Affairs statement:

- He was trained on the dangers of positional asphyxia from departmental training and was cognizant of those dangers during this incident. (6)
- He was familiar with symptoms for excited delirium. (6, 7)

Hyde testified in his February 23, 2019, deposition:

- Positional asphyxia was discussed in his IMPD academy training. (4:12-19)
- IMPD General Order 8.1 (Prisoner Handling, Transportation and Escape) was in effect at the time he was hired by IMPD on December 7, 2015. (6:3-13)
- He had not had any training outside of his initial Academy training on positional asphyxia. (8:20-24)

**V.   Relevant Testimony on encounter with Northington, in part:**

**Civilian witness Grady Brian Rogers testified in his February 6, 2019, statement:**

- She was face down on the floor. (7)
- An officer had his knee in her back. (7)

- "And then when the other officer got her, strapped her feet and then one officer had her his foot in her back the others were holding her hands the other one was still holding her face he took that off of her and they just stood there for I'm gonna say a few minutes probably just letting her calm down." (7,8)
- "Her chest was on the ground." (8)
- The officer still has his knee on her when Grady walked away. (9)
- "So I'm probably away from it for I'm standing with them but I'm away from it for two or three minutes - before she quits the, all the kicking and all you know the things that she was trying to get up you know still trying to fight 'em. And ,um and the stopped, so I'm thinking, oh great, they finally calmed her down. she finally wore out. And a matter of fact, he said that he said she, I think she's finally wearing down. (9)
- The officer with his knee in her back stated that she's finally calming down. (9)
- "... When they, she calmed down, they waited several minutes and then rolled her to the other side and when they rolled her to the other side her eyes rolled back and you could see that something wasn't right. They checked her pulse. Said, she don't have a pulse take the handcuffs off took the handcuffs off laid her down." (9, 10)
- "But the entire time there's that one guy I think he was a kind of a light skinned black guy that was" ... and he agreed that officer was the one with the knee in the back. (12)
- "the guy that replaced me, I think he kind of had his hands you know like on her shoulders. I don't know how much pressure he was putting, but." (13)
- "After they connected the two cuffs I think she was still trying to spit and I think around that time, she stood up or whatever and they all ended up on the floor in the middle aisle." (7)
- Three officers were on her. (8)
- "At that point... I can think of the white officer he had one of his legs I think in her back. (19)
- "...with all of them I thought somebody was gonna be hurt" (19)

- "So to me, I would have thought she just gave up but then they it seemed like the whole scenario changed like OK she's not moving like no she's really not moving no more" (20)

**Civilian witness Jessie Russell testified in his February 6, 2019, statement:**
- There were three cops on Northington; they were on the floor. (8)
- He remembered everyone was standing around her but there was a point in time that she stopped moving. (8)
- The white officer had his legs in her back. (19)
- One was on this arm and the black officer was on the other arm. (19)

**Civilian witness Janena Journey testified in his February 6, 2019, statement:**
- Northington stated "I can't breathe, I can't breathe" during the struggle with the officers. (5, 7)
- She was sweating a lot. (5)

**Detective Jackson testified in his Internal Affairs statement:**
- It was his best estimate that it took a good five to six minutes from the time Northington punched Haley in the face to the time that the officers got the third set of handcuffs on her. (5)
- The officers dragged Northington into the aisle and she was on her stomach; She was in a prone position and on her stomach when they realized she was unconscious. (9)
- He was aware of the dangers of positional asphyxiation and that is why he said "can we get her turned over". (9)

**Detective Jackson testified in his deposition:**
- He did not recall Northington shouting and screaming. (15:22-23)
- He did observe that she had profuse sweating, unexpected physical strength; she was thrashing; he was not surprised that she weighed 313 lbs. (16:5-17:19)
- He was not aware or recognize that Northington's weight and size and because of the excited delirium, the sweating, the running around, that essentially this

schizophrenia attitude increased her likelihood of a terrible event from positional asphyxia. (18:7-18)

- He thought she was mentally ill. (22:16-20; 23:7-8)
- He told the responding officer that she was mentally ill. (26:2-10)
- Northington fell into the aisle as they were about to step into the aisle. (32:24 – 33:14
- Northington was on her stomach for less than a minute or so. (35:5-11)
- It was not that long when he heard someone say that I don't think she's breathing. (35:12-15)
- He did say roll her over, get the handcuffs off and start CPR. (35:20-23)
- From his training and experience it was common if a person is handcuffed for a short period of time that a person may use a little leverage to maintain some sort of control to the person that's handcuffed. (36:19-23)
- He was vaguely familiar with the Eric Garner case involving NYPD and positional asphyxia. (37:3-15)
- He has been trained not to apply a knee to the neck area when a person is being detained but a knee to the back was allowed as long as it's not there for a long period of time. (38:21 – 39:5)
- From his past experience and with officers that he worked with once that person is detained they are known to rise up and turn that person on their side. (39:2-5)
- He claims he did not witness any of the force used by the officers against Northington as alleged by civilian witness Grady Rogers. (39:6 – 44:6)
- He did not witness any misconduct from the officers. (48:10-12)
- He was told by Northington's daughter, before the officers arrived, that her mother was paranoid schizophrenic when she was off of her medications, that she was possibly self-medicating, that she was probably taking some drugs to self-medicate, and that she was off of her medication for approximately 2 -3 years. (50 16:16-21)
- The entire incident from start to finish from the time that the officers arrived to the time that Northington had difficulty breathing was about 5 minutes. (53:13-16)

**Officer Robert Haley testified in his Internal Affairs statement:**

- After we get her cuffed, we were at the {pews}, sit her on the ground, well, we tried to get her on the ground because she was still fighting but she, now she's on the ground face first. (2)
- Officer Cooper is there, he's on the ground with her and then I believe officer Monday shows up. (2)
- She wasn't on the ground for too long when I heard her starting to breathe weird, I said she's not breathing right. (2)
- I remember Cooper had his knee in her lower back area but it wasn't for too long. (2)
- She was still breathing and probably about 30 seconds later she just stopped breathing, I really don't know the certain amount of time but I think it was maybe about 30 seconds. After she stops breathing and I said hey guys she's not breathing. (3)
- After we got her cuffed, we tried to stand her up to move her somewhere else and that's when she fell on the ground. I think it was because of the four of us trying to do different techniques to get her on the ground, maybe. (4).
- I actually placed a final handcuff to get her detained so I was with her the entire time and we stood her up I was with her and all the way to the ground I was with her. (4)
- I just remember her saying "get off of me." (5)
- Her breathing sounded like she was snoring and I said hey guys she's breathing weird. (5)
- When I noticed she was unconscious she was still face forward on the ground. And then when we noticed actually that she wasn't breathing we flipped her over on her back. (6)
- Northington weighed at least 250 pounds and was obese. ((7)
- He was not exactly sure of how long after Northington was handcuffed that she stopped breathing. (8)

**Officer Robert Haley testified in his deposition:**

- He would not argue with the coroner's report that Northington weighed 313 pounds. (17:14-16)
- Northington was on the floor, completely in the aisle, while handcuffed behind her back and was laying on her stomach. (24:21 – 25:19)
- Cooper was on the floor with her. (26:7)
- Cooper did have his foot, or leg or knee on Northington's back. (26:15-17)
- He just remembered seeing Cooper's knee and he immediately told him to move his knee. (26:25-27:1)
- He did not know if someone was holding Northington's feet or not. (27:9-10)
- He was not on her body as he was standing up. (27:13-18)
- He heard Northington state "Get off me" but not sure how many times. (28:2-11)
- She was saying "Get off me" from the time she started hitting, striking Officer Cooper and she also said it when she was lying face down. (28:19-23)
- He could not recall if he ever used his hands to restrain her shoulders, and did not remember grabbing her or using his feet or anything on her body while she was on the ground and did not recall whether he used his hands or not. (29:3-24)
- Cooper's knee was touching her body. (30:16 – 31: 5)
- Officer Monday was helping but he did not know what area of her body he was holding or grabbing. (31:10-12)
- He did not recall whether he used his hands to keep Northington from rolling over. (33:7-9)
- He heard a sound like snoring, a deep breathe from Northington. (34:24-25)
- All of the officers backed off when they noticed she was breathing weird or not breathing normal. (35:2-6)
- Northington was rolled over immediately after hearing the funny breathing and the handcuffs were removed. (35:17—36:1)
- Cooper's knee was on Northington's lower back, kidney area, for probably 3 to 5 seconds and the majority of his weight was not on the small of Northington's back. (39:1-22)

- It was a 4-5 minute duration from first interaction with Northington until he noticed she was not breathing or having difficulty breathing. (39:23-403)

**Officer Lane Cooper testified in his Internal Affairs statement:**
- Northington was no longer resisting when they got her handcuffed and to the ground (4,5)
- When we got her to the ground the fight that she had brought on initially was, it did a complete 180. So I mean we went to the ground and there was no fight at all anymore which then is what raised my concern that we realized she's not breathing. (5)
- She was on her stomach, Northington physically assisted the officers because she walked herself over so they could lay her down. (5)
- Northington was on the ground for about a minute before the officers noticed she was not breathing. (5)
- He and Northington tripped in the aisle and he ended up on the ground with her. (7)
- He considered Northington to be obese and estimated her weight at 280 lbs. (7, 8)

**Officer Lane Cooper testified in his deposition:**
- Once the handcuffs were placed on Ms. Northington, we escorted her, with her assistance, to the center aisle in between the pews. We then placed her down onto the ground chest down, because Ms. Northington continued to kick thrash and try to spit and bite. (10:24-11: 5)
- We just helped her to the ground. There was no take-down. She assisted us to the ground. (16:11-13)
- I don't recall how we actually got her to the ground I believe she just assisted us to the ground by going down to her knees and then onto her stomach. (18:5-8)
- She was put on her stomach. (19:15-16)
- He did not recall exactly where he was in relationship to her body, he did not recall where officer Haley was, he did not know where officer Jackson was, But he did know that officer Hyde came on the scene and he was holding her legs down from kicking at us, But did not know how he was doing that. (18:17 – 19:18)

- He did not recall if he did anything in an attempt to hold Northington down. (19:19-21)
- Northington was on her stomach for a minute or two minutes before somebody noticed a problem. (21:7-9)
- He does not remember seeing another officer holding her shoulders or any other part of her body. (21:14-15)
- He did not recall where Haley was. (21:16-18)
- They noticed a change in her breathing. It became shallow or not at all, so we had rolled her over into what we would call the recovery position and checked her for a pulse, the recovery position is on your side, we checked for a pulse. We didn't feel a pulse. The handcuffs were immediately removed. She was placed on her back and chest compressions were started. (21:25 – 22:8)
- He did not hear Northington say anything while she was on her stomach. (24:17-23)

**Officer Ronald Monday testified in his Internal Affairs statement:**
- He saw Officer Cooper on her back initially. (4)
- Officer Hyde had put his arms or legs over her legs because she was kicking him. (4)
- Northington was rolled over and CPR was started. (5)
- He was trying to talk to her to calm her down but was not getting a response, saw her breathing get faint and then it just stopped. (5)
- It could have been a couple of minutes from the time Northington was moved to the aisle until she stopped breathing. (7)

**Officer Ronald Monday testified in his deposition:**
- She was lying flat on her stomach. (15:6)
- He was at her right arm and right shoulder. (15:7-9)
- Hyde tried to secure her legs, he was just straddling her legs. (16:16-23)
- Cooper had his knee on her back in the very beginning. (17:1-13)
- He noticed Northington no longer had respirations. (18:10-13)

- He heard snoring sounds and then the respirations stopped, the handcuffs came off and Northington was immediately rolled over, CPR was started. (19:17-20)
- He had thought about positional asphyxia when Northington was on her stomach. (21:12-15)

**Officer Justin Hyde testified in his Internal Affairs statement:**
- As he walked through the first door he saw a group of people tussling, the female, a male and uniformed officers were in a group fighting and as he ran up they all went to the ground and the male was on top of the female. (2)
- The female started kicking her legs so I just knelt down, I put my legs, my knees, and hands on her calves and ankles to keep her from kicking and biting. (2)
- We weren't in that position for very long and we noticed that her breathing wasn't as prevalent and as heavy as what it was. At that point we rolled her to her side to get a better handle of what her condition was. It was determined that she was either softly breathing or not breathing. (2)
- We noticed that she was either not breathing or having struggled breathing while she was on her stomach. (4)
- He described Northington to be breathing heavily and grunting, normal noises people are making when they are fighting. (5)
- Northington was on the ground in the aisle less than two minutes before it was noticed that she was not breathing. (5)
- He was aware of the dangers of positional asphyxia and was cognizant of those risks as he was dealing with Northington. (6)

**Officer Justin Hyde testified in his deposition:**
- It looked like it was an unorganized kind of mass falling and all five of the individuals went to the ground. (12:15-13:2)
- They were all in the main aisle. (14:13)
- I observed her legs kicking and flailing so I knelt down and secured her legs with my hands and my knees or legs. (17:1-7)
- He did not see what the other offices were doing. (17:15)
- He did not think about positional asphyxia during the struggle. (19:19 – 20:15)

- He did not see anyone put a foot, a knee, a leg, or hand on the upper back of Northington. (23:5-9)
- He was holding Northington's feet for no more than two minutes, possibly one minute before it was noticed that Northington's breathing changed. (23:21 – 24:8)
- Northington was rolled onto her side into the recovery position at the point we realized her breathing had changed. (24:24 – 25:1)

**VI.    Issue # 1 – Whether the actions of the IMPD officers in restraining Northington in a prone position were objectively reasonable in light of the facts and circumstances confronting them?**

The evidence in this case, based on the testimony of the officers, is that each officer was aware and familiar with the IMPD General Order 8.1 regarding Prisoner Handling, Transportation and Escape, and were familiar and aware of the provisions and warnings in the General Order regarding positional asphyxia and excited delirium.

The evidence in this case demonstrates that Northington was handcuffed behind her back and was placed in a prone position by the officers, with Cooper using force by placing his knee on the back of Northington and that Northington remained on her stomach until the officers noticed that she was not breathing. She was then rolled over, the handcuffs were removed and CPR was started.

The evidence also shows that officers kept Northington in a prone position for a period of time until the officers noticed a change in her breathing and that she had stopped breathing. It was only after the officers noticed Northington either having difficulty breathing or not breathing at all, that they then rolled her off of her stomach, removed the handcuffs and started CPR.

## Conclusion

It is my opinion, after a careful review of the facts and circumstances facing the officers, that IMPD officers placed Northington, a morbidly obese woman, on her stomach and caused her to remain on her stomach while she was handcuffed behind her back, and by doing so, created a greatly increased risk of Northington suffering from positional asphyxia that may lead to serious injury or death. The officer's conduct was unreasonable as it reflected a departure from generally accepted police practices regarding the use of force, positional asphyxia, excited delirium, and a violation of the IMPD General Order 8.1.

The officers should have followed the IMPD General Order 8.1 and not have left Northington on her stomach as that position could cause interference and difficulty for Northington to breathe and may lead to serious injury or death, and instead should have moved her onto her side, into the recovery position, allowing for less interference with normal breathing.

It is also my opinion that Cooper used unreasonable force by placing his knee on the back of Northington while she was in a prone position and this was unreasonable, and a departure from generally accepted police practices regarding the use of force, positional asphyxia, excited delirium, and a violation of the IMPD General Order 8.1.

Cooper should not have placed his knee anywhere on Northington's back as it is with common sense and reason, that any pressure, including any amount of Cooper's body weight on Northington's back, would cause increased interference and difficulty for Northington to breathe and may lead to serious injury or death.

It is also my opinion, based on the testimony of the civilian witnesses and the officers, that Northington was not an immediate threat to the safety of the officers or anyone else, while she was handcuffed behind her back and laying in the aisle in a prone position. While the testimony may indicate that Northington was struggling and thrashing while in

the prone position, it was also possible for the officers to step back from Northington to create distance and space to avoid being contacted by Northington.

Further, it was also possible that Northington was not actually resisting the officers but her struggles including her thrashing, were due to oxygen deficiency and indicative of a person who is struggling to breathe and is desperately attempting to obtain more oxygen to sustain life.

## VII.  Closing Comments

I have provided my opinions based upon my training, experience, and after a careful evaluation of the totality of all the materials and circumstances that have been provided to me in this matter. I used all of the facts and data known to me and applied generally accepted police investigative and management principles and methods. I hold the opinions set forth above to a reasonable degree of professional certainty in the field of law enforcement, based on longstanding and well accepted law enforcement practices.

This concludes my findings, conclusions, and opinions at this time. I respectfully reserve the right to supplement or otherwise modify my opinions based on the receipt and examination of additional information.

Very sincerely yours,

*Robert R. Pusins*