IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| THE ESTATE OF ELEANOR NORTHINGTON | ) | Case No. 1:21-cv-406-RLM-TAB |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| THE CITY OF INDIANAPOLIS, | ) | |
| LANE COOPER, | ) | |
| ROBERT HALEY, JR., | ) | |
| JUSTIN HYDE, | ) | |
| BRUCE JACKSON, and | ) | |
| RONALD MONDAY. | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

I.     **Introduction**

Eleanor Northington was a wife, mother, and Christian who had a history of bipolar

disorder and schizophrenia. She did not have any criminal history and never had a history

of violence. One thing that often helped her cope with her diagnoses was attending

church services. In February 2019, Ms. Northington's family took her to a church service

to lift her spirits. During the church service, Ms. Northington began to experience a

mental health crisis and started acting erratically.

Bruce Jackson, an off-duty police officer, was attending the church service. After

efforts of attempting to get Ms. Northington to calm down, Jackson called 911 and

requested police assistance. When officers arrived, they approached a then-calm Ms. Northington, who began to again act manically once the officers approached her.

The officers managed to detain Ms. Northington in handcuffs behind her back in a matter of minutes. Once Ms. Northington was handcuffed, the officers moved her from the church pews, where she was sitting, to the floor in the center aisle. Once the officers moved her to the floor, she was placed on her stomach and an officer placed a knee in her back. After minutes of struggle on the floor and being placed in a prone position on her stomach, Ms. Northington stopped breathing. Officers removed the handcuffs and initiated CPR while waiting for the medics, who arrived 30 minutes after being called.

The medics took Northington to the hospital where she never regained consciousness. She died two days later. The Estate filed suit against the five individual officers for excessive force under the Fourth Amendment and the five officers and City of Indianapolis for battery under state law. The Defense then filed a motion for summary judgment.

The Defendants' motion for summary judgment [Dkt. 80-1] should be denied. A reasonable jury could conclude that the officer's conduct of placing of Ms. Northington, an obese woman, on her stomach and placing a knee in her back was an unreasonable use of force and in violation of their training and standard police procedures, which directly caused Eleanor Northington's death. Officers are trained to avoid these types of actions when arresting individuals experiencing a mental health crisis, as testified by plaintiff's expert, Robert Pusins. Defendants' motion for summary judgment ignores these

obvious facts and fails to mention the IMPD training manuals regarding these matters. Accordingly, qualified immunity is not appropriate in this circumstance.

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS AND FACTS IN DISPUTE

### A.  *Ms. Northington was schizophrenic and was experiencing a mental health crisis*

In 2007, Eleanor Northington was diagnosed with bipolar disorder and schizophrenia [Dkt. 80-1 (Montgomery Dep. 23:9-24:15)]. Northington has always struggled with her mental health, but February 2019 was especially challenging for Ms. Northington. She had recently had a baby, her boyfriend had left her to care for the children on her own, and she was struggling with depression. Eleanor Northington's daughter, D'Asia Montgomery, moved in with her mother to help support her through this difficult time. Eleanor Northington had not taken her prescribed medication for two or three years because of the way the medication made her feel [Dkt. 80-2(Montgomery Deposition 22:2-23:8)].

On February 6, 2019, D'Asia Montgomery decided to take her mother to church in an attempt to lift her spirts. Worship music had helped Eleanor in the past, so D'Asia, along with Eleanor's two minor children, and D'Asia's boyfriend, Daniel Reese, decided to attend the prayer service at Christ Our Healer Church [Dkt. 80-2 (Montgomery Dep. 28:21-29:19; 36:9-16)]. Northington and her family arrived when the service began at 7:00 p.m. and sat in the pews. Shortly after arriving Eleanor Northington stood up to interact and participate in the worship [Dkt. 80-2 (Montgomery Dep. 37:19-38:3)] About thirty to forty parishioners were present at the prayer service [Dkt. 80-2 (Montgomery Dep. 37:24-38:6)]. After a period of time, Northington became disruptive and eventually left the

sanctuary and even attempted to leave the premises, but parishioners would not allow her to do so [Dkt. 80-2 (Montgomery Dep. 42:8-21)].

Officer Bruce Jackson, an off-duty Indianapolis Metropolitan Police Department officer attended the prayer service on February 6, 2019 [Dkt. 80-3 (Jackson Dep. 5:5-22; 7:1-4)]. Jackson was a behavior health specialist with IMPD east district and worked as part of IMPD's Crisis Intervention Team [Dkt. 80-3 (Jackson Dep. 7:3-4)]. He was trained to respond to any mental health situations that required crisis intervention [Dkt. 80-3 (Jackson Dep. 7-10)]. It was Jackson's job to respond to the homes of those who are immediately detained for mental illness or for those who need guidance in their mental health services [Dkt. 80-3 (Jackson Dep. 7:7-14)].  Jackson arrived at the church prior to Northington. He watched her walk around the church, raising her hand, and pumping them in the air [Dkt. 80-3 (Jackson Dep 11:7-10; 20:7-20)]. He observed Northington leave for a period of time. [Dkt. 80-3 (Jackson Dep. 20:20-22)].

Jackson witnessed Ms. Northington exhibit this behavior and noticed that she was also sweating profusely and appeared to have enhanced physical strength [Dkt. 80-3 (Jackson Dep. 16:3-18)]. Jackson's training said he should obtain medical treatment as soon as possible for individuals exhibiting signs such as this. Northington wanted the pastor to pray over her, and when he did, she calmed down [Dkt. 80-2 (Montgomery Dep. 41:1-5)]. She would only become aggressive to individuals who approached her [Dkt. 80-2 (Id. at 45:2-23)].

Jackson eventually decided to call the police and request assistance [Dkt. 80-3 (Jackson Dep. 22:6-10)]. While he waited for police assistance to arrive, he spoke with

D'Asia Montgomery about Eleanor's mental health struggles [Dkt. 80-3 (Jackson Dep. 26:2-10)]. Montgomery told Jackson that Ms. Northington was schizophrenic and that she has been off her medication for two or three years [Dkt. 80-3 (Jackson Dep. 26:3-10; 50:11-21)]. At the time the officers arrived, Jackson knew that Northington was suffering from a mental health crisis and knew her diagnoses [Dkt. 80-3 (Jackson Dep].

### B.  The Arrest and Detention of Eleanor Northington

Officers Robert Haley, Jr. and Lane Cooper arrived at the church at 8:33 p.m. [Dkt. 80-4, 5 (Cooper Dep. 4:18-5:1) (Haley Dep. 10:5-15)]. They met Jackson in the foyer of the church where Jackson told them that Eleanor Northington was mentally ill and exhibiting aggressive and bizarre behavior, but failed to mention that she was schizophrenic and off her medication [Dkt. 80-5, 3(Haley Dep. 8:21-24; 11:25-12:5) (Jackson Dep. 26:2-3)]. At 8:34 p.m., Haley requested an ambulance for her to be transported to the hospital prior to his entering the sanctuary [Dkt. 80-5 (Haley Dep. 11:18-24; 14:12-14)]

When Haley and Cooper entered the sanctuary, they observed Ms. Northington sitting calmly on the pews near the back of the church (Cooper Dep. 9:14-18) (Jackson Dep. 27:2-12)] It wasn't until they approached her, that she began to act aggressively once more [Dkt. 80-4 (Cooper Dep. 9:22). When officer Haley approached her, she hit him in his face [Dkt. 80-5 (Haley Dep. 13:1-6)].  She then approached Cooper and punched him in the face as well [Dkt. 80-2, 5 (Montgomery Dep. 45:12-18; 47:13-17) (Haley Dep. 18:7-9)] Haley then called and indicated that they had a "resistor" [Dkt. 80-5 (Haley Dep. 18:15-16)].

The officers struggled to get Ms. Northington detained in handcuffs [Dkt. 80-2 (Montgomery Dep. 47:18-48:4)]. Officer Cooper grabbed one of her arms behind her back and Officer Jackson grabbed the other over her head [Dkt. 80-4, 3(Cooper Dep. 9:25-10:2) (Jackson Dep. 27:9-28:1)]. When Officer Hyde arrived, he witnessed a group of individuals standing and engaged in a struggle within the church pews [Dkt. 80-6(Hyde Dep. 11:1-21)]. Three of the individuals were officers and one was Ms. Northington [Dkt. 80-6 (Hyde Dep. 13:3-14:5)]. The group stumbled and the officers lost control of Ms. Northington's arm. Officer Jackson attempted to perform a leg sweep but was unsuccessful.

After the officers were able to regain control of Ms. Northington, she briefly fell in between the pews. She continued to struggle with the officers. The officers got ahold of her arm and applied a set of handcuffs, but they needed additional sets because of her size [Dkt. 80-3 (Jackson Dep. 31:10-13)]. Within a couple of minutes, they were able to get three sets of handcuffs on Northington with her hands behind her back while she was seated in the pews [Dkt. 80-4, 5, 3 (Cooper Dep. 10:22-24; 17:9-12) (Haley Dep. 20:5-21:5) (Jackson Dep. 29:5-13; 30:25-31:20)]

### C. Officers Move Northington to the Center Aisle and Place Her on Her Stomach

Once handcuffed, the officers made the decision to move Eleanor Northington from the pews to the center aisle between the pews [Dkt. 80-4, 5, 6, 7 (Cooper Dep. 10:24; 11:2; 16:8-13; 17:17-22); (Haley Dep. 24:15-25:3) (Hyde Dep. 14:10-20) (Jackson Dep. 32:16-17) (Monday Dep. 10:24-11:2; 11:17-25; 12:2-5; 13:18-25: 14:21-21; 16:8-13; 17:17-22)].

As the Officers were attempting to move her from the pew to the center aisle, Northington tripped on a bench and fell. Officer Jackson also fell and injured himself. He decided to step a few feet away from the situation for a few minutes to nurse his shoulder. Northington was then moved onto her stomach and held there for the duration of the time she was on the floor.  [Dkt. 80-7, 5, 4 (Monday Dep. 15:6) (Haley Dep. 13:11-25) (Cooper Dep. 18:15-16)]. Northington, at one point, asked the officers to get off of her [Dkt. 80-5 (Haley Dep. 28:2)]. Northington continued to thrash and move around on the floor. [Dkt. 80-5 (Haley Dep. 25:11-26:12-14; 40:18-25)]. Officer Hyde held her legs and feet down. [Dkt. 80-4, (Cooper Dep 19:9-13) (Hyde Dep. 17:1-7) (Monday Dep. 15:15-22)]. Officer Cooper then positioned his knee on Northington's back [Dkt. 80-5, 7 (Haley Dep. 26:11-17); (Monday Dep. 17:4-6)]. It is unclear when Officer Cooper removed his knee from Northington's back. One witness, a pastor at the church, stated "then when the other officer got her, strapped her feet, and then one officer had his foot in her back, the others were holding her hands, and the other one was still holding her face, he took that off of her and they just stood there for, I am gonna say a few minutes probably, just letting her calm down" [Dkt. 80-17 (pages 7 and 8)] Others claim that he only removed his knee when Officer Haley told him to do so [Dkt. 80-5 (Haley Dep. 26:1-25; 27:11-18; 31:2-5)].

### D. Eleanor Northington Stops Breathing

Almost immediately after Cooper removed his knee from Northington's back, Officer Monday and Officer Haley noticed problems with Northington's breathing [Dkt. 80-5, 7 (Haley Dep. 32:22-25) (Monday Dep. 17:16-18:13)].  Haley told the group that "something's not right," and they backed up [Dkt. 80-5 (Haley Dep. 35:1-5)]. At this point,

Northington was on the floor on her stomach for two minutes [Dkt. 80-4, 5, 6, 7, 3]
(Cooper Dep. 21:7-9) (Haley Dep 34:12-17) (Hyde Dep. 23:15-24:1) (Jackson Dep. 35:8-
11) (Monday Dep. 17:19-18-4)].

### E.  Northington's hospitalization and death.

An ambulance arrived at the church about ten minutes after Northington stopped
breathing. The ambulance transported her to Eskenazi Hospital [Dkt. 80-2 (Montgomery
Dep. 52:1-19)]. She was placed on a ventilator but showed little brain activity [Dkt. 80-2
(*Id.* at 53:3-5)]. Northington was removed from life support the following day. [Dkt. 80-2
(*Id.* at 54:2-7)].

The Marion County Coroner's Office performed an autopsy after Northington's death.
[Dkt. 80-8]. The coroner's office stated that the cause of death was "Anoxic Brain Injury in
the Setting of Morbid Obesity, Cardiac Hypertrophy, Schizophrenia, and Struggle with
Others." [Dkt. 80-8 (*Id.* at 1)] The report also states that the manner of death is
undetermined and goes further to say that "the decedent was involved in a struggle with
others that could have contributed to her sudden cardiac death and resultant anoxic brain
injury. If such a struggle caused the decedent's death, the manner of death would be
classified as "homicide" [Dkt. 80-8 (*Id.* at 3)].

### F.  The City's Policies and Procedures

General Orders are the written policies that govern how IMPD officers carry out their
duties. These orders provided protocols and training guidelines for officers to abide by in
various scenarios as well as guidelines relating how frequently officers should be trained
on various subjects.  General Order 8.1 [Dkt. 80-9] provides officers with information

regarding positional asphyxia, including warning signs that could result in death by positional asphyxia. The order also states that "officers should avoid leaving any prisoner on their chest or stomach for any period of time longer than is absolutely necessary, regardless of the type of restraint being used [Dkt. 80-9 (GO 8.1, 4)]. The order also states, "if a subject is suffering from any of the signs below and placed in a prone position that interferes with breathing, there is a greatly increased risk of positional asphyxia" [Dkt. 80-9 (*Id*)]. These signs included aggressive behavior outside the norm, shouting and screaming, profuse sweating, unexpected physical strength, thrashing after restraint, paranoia, etc. [Dkt. 80-9 (*Id*)]. Lastly, the general order also noted that obese subjects are more at risk for positional asphyxiation [Dkt. 80-9 (*Id.*)].

General Order 4.7 addresses mental writs. The order stated that, while attending the IMPD Academy, recruited officers will receive training on how to deal with individual(s) with a mental illness [Dkt. 80-10 (GO 4.7, 6)]. This order also stated that "officers shall also receive state-mandated in-service training on the subject annually" [Dkt. 80-10 (*Id*)].

## II. Argument and Analysis

### 1. Estate's claims are limited to those raised in its second amended complaint – which have not been otherwise dismissed or stipulated by the parties.

The Estate filed Fourth Amendment excessive-force claim against each individual officer and a state-law battery claim against all Defendants. For the reasons below, the Defendants are not entitled to summary judgment on any of the claims.

### 2. Plaintiff's federal claims against the individual officers relate back under Fed. R. Civ. P. 15

The Estate filed suit against the officer for constitutional violations in a timely manner considering the circumstances. The addition of the officers to the case relates back to the original complaint under Rule 15. When evaluating the sufficiency of a complaint, the Court is to construe the complaint in the light most favorable to the plaintiff, accepts as true all well-plead facts therein, and draws all reasonable inferences in plaintiff's favor. *Cincinnati Life Ins. Co. v. Beyrer,* 722 F.3d 939, 946 (7th Cir. 2013).

In *Krupski*, the Supreme Court examined whether Rule 15(c)(1)(c) allowed amended pleadings to relate back when the plaintiff mistakenly sued a subsidiary, only to realize that she meant to sue its parent corporation. 560 U.S. at 543-44. The Court held that the Plaintiff made a "mistake", allowing her pleadings to relate back, the Court explained that whether an amended pleading relates back depends on "what the prospective defendant knew or should have known" and "not what the plaintiff knew or should have known." *Id.* at 428. The Court defined a mistake as "an error, misconception, or misunderstanding; and erroneous belief," *Id.* and further described the word to include "'a misunderstanding of the meaning or implication of something'; 'a wrong action or statement proceeding from fault judgment, inadequate knowledge, or inattention': 'an erroneous belief'; or 'a state of mind not in accordance with the facts." *Id.* (quoting Webster's Third New International Dictionary 1446 (2002)).

The purpose of Rule 15(c) is to allow amended complaints to relate back to the original filing for statute of limitations purposes when the amended complaint is a correction of a mistake about the identity of the defendant. At the time suit was filed, there were over fifty possible officers that could have been named as defendants. With limited

time to file a complaint within the statute of limitation, The Estate was unable to determine which of the fifty possible officers on scene at the time of the incident were directly involved. At the time the case was filed, discovery had not yet been conducted and The Estate did not know the identities of the officers that were directly involved in the case. As soon as The Estate had knowledge of the identities of the five officers, it filed an amended complaint.

Under Rule 15(c)(1)(C), an amendment to a pleading that "changes the party or the naming of the party against whom a claim is asserted" can only relate back to the date of the original pleading if the added party "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity."

### A.  Counsel for The Estate had not been retained in January 2020

In January 2020, Defendant's counsel emailed the identities of the five officers to the lead attorney on the case at the time, which was not The Estate's current counsel. Defendant's counsel copied The Estate's current counsel on that same email. As stated above, at the time Defendant's counsel sent the identities of the five officers, The Estate's current counsel was not lead counsel on the wrongful death case and therefore did not save the names that had been provided almost a year prior to The Estate's current counsel.

### B.  Equitable Tolling

Even if the John Doe rule does apply, the doctrine of Equitable Tolling should apply in this scenario. Equitable tolling is reserved for rare instances in which a plaintiff was "prevented in some extraordinary way from filing his complaint in time." *Threadgill v.*

*Moore U.S.A, Inc.*, 269 F.3d 848, 850 (7th Cir. 2001) In these types of cases, the plaintiff bears the burden to establish that (1) she "diligently" pursued her claim; and (2) "some extraordinary circumstances" prevented her from filing her complaint. *See Credit Suisse Securities (USA) LLC v. Simmonds,* U.S., 132 S. Ct. 1414, 1419, 182 L.Ed.2d 446 (2012). In this case, The Estate diligently pursued the claim. She obtained counsel well within the statute who decided not to file the case just days before the statute of limitations ran. These circumstances were both extraordinary and out of the plaintiff's control *Id*. The Estate then retained its current counsel, who had been the same attorney to initially open the estate, to file the personal injury claim. At this point, The Estate had just a few weeks to file its claim.

In its original complaint, The Estate sued the City of Indianapolis, the Indianapolis Metropolitan Police Department, and John Doe Police Offices 1-50 [Dkt. 80-11]. Prior to retaining current counsel for the personal injury claim, The Estate had hired another attorney for the wrongful death case. Current counsel was a part of the case simply to open the Estate, he was not the lead attorney on the wrongful death case until just days prior to the case being filed. This was only a few days prior to the statute of limitations deadline. To ensure that suit was filed in a timely manner, The Estate named the Defendants that it could along with the John Doe officers. On April 2, 2021, after discovering the proper identities of the five officers involved, The Estate filed a second amended complaint to include the names of the five officers [Dkt. 80-12]

The Defendant claims that the Estate's counsel possessed the officers' names as early as January 2020 but chose not to sue them within the statute of limitations. The

incident occurred on February 6, 2019, and the Estate timely filed its initial complaint on January 26, 2021. Suits under § 1983 use the statute of limitation that states employ for personal injury claims, which is two years. This means that the Estate needed to file suit by February 6, 2021, which it did. The Estate's former counsel decided to drop the case just before the statute of limitations ran, which is when The Estate hired current counsel to take over as lead attorney on the wrongful death case.

### 3. Each officer had sufficient personal involvement to be held liable for constitutional deprivation.

"A Plaintiff must show that each Government-official defendant, through the individual's own actions, has violated the Constitution" *Ashcroft v. Iqbal,* 556 U.S. 662, 676 (2009). The Estate has sued all five officers who played a role in detaining and ultimately killing Eleanor Northington. Each officer had sufficient personal involvement to be held liable for constitutional deprivation. To establish such a claim under § 1983, the Estate must show that each of the defendants were personally involved in depriving Ms. Eleanor Northington of her constitutional rights. *Walker v. Taylorville Corr*. Ctr., 129 F.3d 410, 413 (7th Cir. 1997); *Grossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) (quoting *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994)). Each of the five officers had a hand in the events that ultimately led to Eleanor Northington's death.

### 4. The officers are not entitled to qualified immunity.

The Defendants assert that the five officers are entitled to qualified immunity against the Fourth Amendment claims alleged by the Estate. "Government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which

a reasonable person would have known." *Harlow v. Fitzgerald,* 457, U.S. 800, 818

(1982). "Qualified immunity gives government officials breathing room to make

reasonable but mistake judgment and protects all but the plainly incompetent or those

who knowingly violate the law." *Messerschmidt v. Miller*, 132 S. Ct. 1235, 1244 (2012).

### a.   The Officers violated Northington's Constitutional Rights

The Estate of Eleanor Northington brings its civil rights lawsuit under 42 U.S.C. §

1983. "To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts sufficient to

show that the defendants, acting under color of state law, deprived it of a specific right or

interest secured by the Constitution or laws of the United States." *Bublitz v. Cottey*, 327

F.3d 485, 488 (7th Cir. 2003).

The Estate of Eleanor Northington is suing Defendants, The City of Indianapolis,

and officers Lane Cooper, Bruce Jackson, Robert Monday, Justin Hyde and Robert Haley,

Jr.  in their individual capacity. To establish such a claim under § 1983, the Estate must

show that the defendants were personally involved in depriving Ms. Eleanor Northington

of her  constitutional rights, which is discussed and shown above. *Walker v. Taylorville*

*Corr.* Ctr., 129 F.3d 410, 413 (7th Cir. 1997); *Grossmeyer v. McDonald*, 128 F.3d 481,

494 (7th Cir. 1997) (quoting *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994)).

The Constitutional right at issue is Ms. Northington's Fourth Amendment protection

"for the people to be secure in their persons, houses, papers, and effects, against

unreasonable searches and seizures." U.S. Constitution, IV Amendment. There is no

dispute that officers Jackson, Cooper, Haley, Hyde and Monday were acting under color

of state law, as the Defendants have admitted. (See Dkt. 80-3, 4, 5, 6, 7).

The officers violated Northington's Fourth Amendment right when they used excessive force in attempting to detain her. Excessive force claims are analyzed using the Fourth Amendment's "reasonableness" standard in the context of "an arrest, an investigatory stop or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). The Fourth Amendment protects against the use of force that is not "objectively reasonable." *Kinney v. Ind. Youth Ctr.*, 950 F.2d 462, 465 (7th Cir. 1991). To determine the reasonableness, and therefore the constitutionality of a seizure, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 9-8 (1985) In considering this balance, the court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. When considering this balance, the court views the circumstances "from the perspective of a reasonable officer at the scene." *Id*.

### i. *A reasonable jury could find that the use of force was excessive.*

The Fourth Amendment prohibits unreasonable seizures, including the use of excessive force to "seize" a person at liberty in order to make an arrest. *Graham v. Connor*, 490 U.S. 386 (1989). In *Graham*, the Court settled upon the Fourth Amendment objective reasonableness standard for the use of force during an arrest. A seizure by the use of force may be unreasonable notwithstanding the fact that probable cause exists to arrest the suspect. *Graham*, 490 U.S. at 394; see also *Graham*, 490 at 397 ("The

reasonableness inquiry is an objective one. The question is whether the officers' actions are objectively reasonable considering the facts and circumstances confronting them, without regard to their underlying intent or motivation.").

The inquiry mandated is an objective one: "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Under the Fourth Amendment, "[a] police officer's use of force is unconstitutional if, 'judging from the totality of circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (quoting *Lester v. City of Chicago*, 830 F.2d 706, 713 (7th Cir. 1987). Subjective factors involving the officer's motives, intent, or propensities are not relevant when determining the reasonableness of force. *Rowland v. Perry*, 41 F.3d 167, 173 (4th Cir. 1994). The officer's intentions, whether good or bad, are irrelevant. *Graham v. Connor*, 490 U.S. 386, 396 (1989); *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519-20 (7th Cir. 2012) ("An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest").

The City suggests the Court consider that the officers did not intend to physically harm and ultimately kill Mr. Northington. However, it is undisputed that the officers intended the action, of placing Ms. Northington in a prone position on her stomach and placing a knee in her back, which ultimately resulted in Ms. Northington's death. So long as the officers intended the act, and it was reasonably foreseeable that Ms. Northington

16

could die under the circumstances of being obese, placed on her stomach with a piece of

fabric over her nose and mouth, the fact that the officers did not intend the extent of harm

they caused is not relevant. This is textbook tort law, as Judge Miller of the Northern

District of Indiana has recognized:

> The determination of what is reasonably foreseeable is not judged by the
> subjective opinions of those involved, but is based upon the standard of
> due care in avoiding a result which might reasonably have been anticipated
> in the ordinary experience of men. *Geyer v. City of Logansport (1977), 267*
> *Ind. 334, 370 N.E.2d 333, 337.* If the actor's conduct is a substantial factor
> in bringing about harm to another, the fact that the actor neither foresaw
> nor should have foreseen the extent of harm or the manner in which it
> occurred does not preclude liability. *Id.* Thus, liability does not depend on
> whether the defendant could have predicted injury would happen to the
> plaintiff in exactly the way it did or the statistical likelihood of the
> particular circumstances which befell the plaintiff. On the other hand, if the
> actor should have realized his conduct might cause harm to another in
> substantially the manner in which it is brought about, the harm is
> universally regarded as the legal consequence of the actor's negligence.

*Tabor v. Continental Baking Co.* (1941), 110 Ind. App. 633, 38 N.E.2d 257, trans.

denied, citing 40 Restatement Torts, § 435, comment b. McGill v. Duckworth, 726

F. Supp. 1144, 1157 (N.D. Ind. 1989) quoting *Harper v. Guarantee Auto Stores*,

533 N.E.2d 1258, 1264 (Ind. App. 1989) rev'd in part on other grounds, affirmed in

part on other grounds. 944 F.2d 344 (7th Cir. 1991).

Accordingly, instead of officer intent or subjective factors, the Court is to consider

objective factors to determine reasonableness. The reasonableness of the use of force

under the Fourth Amendment requires a balancing of the nature and quality of the

intrusion on the suspect's physical integrity against the countervailing governmental

interest at stake. The Court requires "careful attention to the facts and circumstances of

each particular case, including the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officer or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396.

In the present matter, consideration of the Graham factors would entitle a jury to conclude that the force used by officers Haley, Hyde, Cooper, Jackson, and Monday was objectively unreasonable and hence unconstitutionally excessive. First, the severity of the crime that began this incident was a class "B" misdemeanor battery crime, which is a very low-level offense. The severity of the crime factor weighs in favor of Ms. Northington. As to the second factor, Ms. Northington was not an immediate threat. At the time Officers placed Ms. Northington on her stomach, Ms. Northington was in handcuffs and not harming anyone. Once in handcuffs, Ms. Northington was not a threat to the officers. Accordingly, the second factor also weighs in favor of Ms. Northington. Finally, as to the third Graham factor, a reasonable jury could conclude Ms. Northington was not resisting by force or flight at the time she was placed on her stomach in the aisle way. It is possible that she was thrashing and kicking because she was struggling to breath. There were multiple instances where witnesses report Ms. Northington telling the officers both "I can't breathe" and "get off me". There are also multiple occasions in which Ms. Northington was calm prior to being approached by the officers. When left alone, Ms. Northington was calm and not a threat to the officers or the public.

A handcuffed non-resisting defendant's right to be free from excessive force was clearly established at the time of the incident. Hadley v. Gutierrez, 526 F.3d 1324, 1333-34 (11th Cir. 2008). In *Myers v. City of Baltimore*, 713 F.3d 723 (4th Cir.2013) the Fourth Circuit found that rarely, if ever, is it appropriate to continue to use force on someone who

is not resisting arrest and is handcuffed. *Estate of Armstrong v. City of Pinehurst*, 810 F.3d 892, 905 (4th Cir. 2016) ("Nor was he an immediate threat to the officers' safety after he was placed in handcuffs."). Thus, officers may not use unreasonable force against handcuffed arrestees who do not present a danger to them and are not resisting. While force must be reasonable when used, any force may be excessive if the plaintiff does not physically resist arrest or physically threaten the officer or others. *Frazell v. Flanigan*, 102 F.3d 877, 884 (7th Cir. 1996). According to IC 35-44-3-3, an individual who is resisting law enforcement is a person who "knowingly or intentionally" (*emphasis added*) forcibly resists, obstructs, or interferes with a law enforcement officer or a person assisting the officer while the officer is lawfully engaged in the execution of the officer's duties. At the time of the struggle with the officers, Ms. Northington was experiencing a mental health crisis. It was impossible for her to knowingly or intentionally resist arrest during this time.

### ii. The officers' use of force was excessive and unreasonable

The Defense states multiple times through its brief that Ms. Northington was resisting arrest from law enforcement [Dkt. 80-13] That is not the case. The charge of "resisting law enforcement" occurs when a person "knowingly or intentionally" "(1) forcibility resists, obstructs, or interferes with a law enforcement offer or person assisting the officers while the officer is lawfully engaged in the execution of his duties as an officer." Ind. Code 35-44-3-1(a)(1).

It is clear that under Indiana law the resistance must involve a use of force, "[O]ne 'forcibly resists' law enforcement when strong, powerful, violent means are used to evade

a law enforcement official's rightful exercise of his or her duties." *K.W. v. State*, 984

N.E.2d 610, 612 (Ind. 2013) (quoting *Spangler v. State*, 607 N.E.2d 720, 723 (Ind. 1993)).

Even if the Defendants' version was taken as true, that Ms. Northington was kicking

and squirming while being arrested, a reasonable jury could also conclude that there was

no probable cause to arrest Ms. Northington for resisting law enforcement on a separate

ground, that being Ms. Northington's reaction of kicking and squirming when placed in

handcuffs by the officers did not constitute "forcefully resisting" as required by the

statute. *Spangler v. State*, 607 NE.2d 720, 723 (Ind. 1993) ("The common denominators of

these definitions are the use of strength, power, or violence, applied to one's actions, to

accomplish one's ends. ("[o]ne 'forcibly resists' law enforcement when strong, powerful,

violent means are used to evade a law enforcement official's rightful exercise of his or her

duties."); *Ajabu v. State*, 704 N.E.2d 494, 496 (Ind. App. 1998) (reversing conviction for

resisting law enforcement because defendant's actions of "twisting and turning" were

active resistance but did not involve "threatening or violent actions toward the police").

This Court recently denied summary judgment and qualified immunity to another

City of Indianapolis police officer on a false arrest claim arising out of a resisting law

enforcement arrest where the plaintiff had engaged in much more physically threatening

behavior than alleged here. *Sturm v. City of Indianapolis*, 2016 U.S. Dist. LEXIS 65144,

22-24 (S.D. Ind. May 18, 2016). In *Sturm*, Defendants alleged that the plaintiff quickly

turned around in a fighting stance, clenched his fists and stared as if he was going to harm

the officer. *Id.* at 23. However, an eyewitness claimed that the plaintiff put his hand up in

the air, asked "[W]hat is going on?", and then casually walked away *Id. at 24*. Based on

the forgoing, the Court could not find that as a matter of law the officer had probable cause to arrest the Plaintiff for resisting law enforcement.

Judge Magnus-Stinson, relying upon the same line of Indiana cases on the crime of resisting law enforcement, recently reached the same conclusion on similar facts. *McPhaul v. Ball State Univ. Police*, 2016 U.S. Dist. LEXIS 34985, 10-13 (S.D. Ind. Mar. 18, 2016) ("Here, there is no evidence that McPhaul "forcibly" resisted police. The only evidence in the record is that McPhaul pulled away from Brand's reach. ... Because the only evidence in the record is that McPhaul pulled away, there thus remains a dispute of fact whether he 'forcibly' resisted arrest and whether Brand had probable cause to arrest him for resisting arrest."). See also *Rhodes v. State*, 20 N.E.3d 223 (Ind. Ct. App. 2014) ("A survey of previous cases shows that merely walking away from a law-enforcement encounter, see, e.g., *Spongier v. State*, 607 N.E.2d 720 (Ind. 1993), leaning away from an officer's grasp, see, e.g., *A.C. v. State*, 929 N.E.2d 907 (Ind. Ct. App. 2010), or "twisting and turning 'a little bit' " against an officer's actions, see, e.g., *Ajabu v. State*, 704 N.E.2d 494, 495-96 (Ind. Ct. App. 1998), do not establish "forcible" resistance").

Ms. Northington was much less "an imminent danger of bodily injury [to an officer]" as required by Walker or "violent forceful resistance" as required by Spongier and K. W.. Just as in Sturm, McPhaul and Bowden, this Court should deny Defendants' summary judgment motion on both the underlying Fourth Amendment claim and on qualified immunity.

### iii.  Sufficient evidence of causation exists.

Excessive force was the approximate cause of Eleanor Northington's death. The Marion County Coroner's Office performed an autopsy after Northington's death and the coroner stated that the cause of death was "Anoxic Brain Injury in the Setting of Morbid Obesity, Cardiac Hypertrophy, Schizophrenia, and Struggle with Others." The report also states that the manner of death is undetermined and goes further to say that "the decedent was involved in a struggle with others that could have contributed to her sudden cardiac death and resultant anoxic brain injury. If such a struggle caused the decedent's death, the manner of death would be classified as "homicide." [Dkt. 80-8]

Eleanor Northington was alive and active while she was at the church and while she was being handcuffed by the officers. It was not until after they placed her in a prone position on the floor that she stopped breathing and ultimately died.

Expert Joseph Felo concurred with the coroner that Northington's death was caused by a struggle with others [Dkt. 80-14]. In his report he stated that Northington's death is properly classified as a homicide because the definition of a homicide is a death that result from the actions of another, and that it was the actions of the police officers restraining Eleanor Northington in a prone position on the floor with her hands handcuffed behind her that caused her to stop breathing and her brain to be starved of oxygen [Dkt. 80-14 (Felo Report, 2)]. The officer's use of force was the proximate cause of Eleanor Northington's death.

### b.  The officers violated their policies and procedures

The City of Indianapolis also claims that the officers are entitled to the defense of qualified immunity. A police officer is entitled to immunity when a reasonable police

officer could have believed that his conduct was constitutional in light of clearly established law and the information he possessed at the time. *Anderson v. Creighton*, 483 U.S. 635, 639 (187);  *Frazell v. E.K. Flanigan*, 102 F.3d 877, 886 (7th Cir. 1996).

Further, many circuits have held that when an officer violates a policy or training of his department, he is on notice that his conduct may be unreasonable and is not entitled to qualified immunity. *Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (training was relevant to whether force was unlawful and whether a reasonable officer would have been on notice). It was objectively unreasonable for the officers to disregard their police training and standards intended to protect detainees from danger and injury. *Gutierrez v. City of San Antonio*, 139 F.3d 441, 499 (5th Cir. 1998). ("[I]t may be difficult to conclude that the officers acted reasonably if they performed an action that had been banned by their department or of whose dangers in these circumstances they had been warned").

Expert Robert R. Pusins concurs that the officers' use of force violated police standards and training. When police take someone into custody, they have a duty to protect them from harm. Contrary to their duty, the officers recklessly ignored their training along with the fact that placing an individual on their stomach with their arm restrained behind their back may have difficulty breathing, especially when they are of the size of Ms. Northington, and this could lead to death. [Dkt. 80-15 (Pusins Report, 14)]. Aware of the dangers to a back handcuffed Ms. Northington in her condition, the officers failed to move Northington into the recovery position, which was contrary to police training and standards. [Dkt. 80-15 (Pusins, 27)]. Further, per Pusins, "It is my opinion,

after a careful review of the facts and circumstance facing the officers that IMPD officers placed Northington, a morbidly obese woman, on her stomach and caused her to remain on her stomach while she was handcuffed behind her back, and by doing so, created a greatly increased risk of Northington suffering from positional asphyxia that may lead to serious injury or death. The officer's conduct was unreasonable as it reflected a departure from generally accepted police practices regarding the use of force, positional asphyxia, excited delirium, and a violation of the IMPD General Order 8.1" [Dkt. 80-15 (Pusins Report, 27)]. Instead of protecting Ms. Northington from harm while she was in custody, Officer Cooper himself inflicted unnecessary and excessive force upon Ms. Northington when he placed his knee on her back. Per Pusins, Officer Cooper "used unreasonable force by placing his knee on the back of Northington while she was in a prone position and this was unreasonable, and a departure from generally accepted police practices regarding use of force, positional asphyxia, excited delirium, and a violation of IMPD General Order 8.1" and these reckless actions and use of force under the circumstances was the cause of Ms. Northington's death [Dkt. 80-15 (Pusins Report, 27)]. After knowingly violating police training and standards, the officers now cannot claim qualified immunity.

It is firmly established that expert reports can suffice at the summary judgment stage. *Abdullahi v. City of Madison*, 423 F.3d 765, 772 (7th Cir. 2005), *Vollmert v. Wisconsin Dept. of Transp.*, 197 F.3d 293, 300-01(7th Cir. 1999) (to avoid summary judgment, a party's expert need not "give a primer on why the facts allow the expert to reach that conclusion"). At the summary judgment stage, while not dispositive and their

admissibility at trial is still an "open question," expert reports are relevant when determining whether officers violated standard police practices and to the reasonableness inquiry. *Abdullahi* at 772. See *Drummond v. City of Anaheim*, 343 F.3d 1052, 1057-1058 (9th Cir. 2003) (decedent's mental disability must be taken into account in the reasonableness inquiry); *Deorle v. Rutherford*, 272 F.3d 1271, 1282-83 (9th Cir. 2001) (same). Violation of police training and practices are relevant to determining whether an officer used excessive force. *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995) ("Although these police department guidelines do not create a constitutional right, they are relevant to the analysis of constitutionally excessive force.") (Internal quotations and citations omitted); *Weigel v. Broad*, 544 F.3d 1143, 1154-55 (10th Cir. 2008) (holding that the training materials are relevant to the Fourth Amendment inquiry, "the reasonableness of an officer's actions must be assessed in light of the officer's training."). Accordingly, Robert Pusins' expert report regarding police standards and practices is relevant to determining excessive force at summary judgment stage.

### c. The officers violated clearly established law

The officers violated clearly established law by using excessive force while trying to detain Eleanor Northington. It was reasonable for them to know, given their training, that Eleanor Northington was at a higher risk for positional asphyxia due to her size and the signs she was exhibiting. The officers went against their training. Additionally, 18 USCA § 242 states that whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or law of the United States…. Shall

be fined under this title" *Id.* A reasonable jury could find that, given their training and the circumstances in front of them, that the officers used excessive force when it came to detaining Eleanor Northington.

### 5.   The state-law battery claims against the individual officers do not fail

The Defendants' arguments against The Estate's state law claims for battery rely upon the same misconstrued version of the facts defendants set forth on plaintiff's excessive force claims. The federal excessive force and Indiana battery standards are essentially the same, and the factual disputes set forth above on the Fourth Amendment excessive force claim precludes summary judgment on the battery claim as well. As explained by Judge Hamilton:

If an officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery. *Crawford v. City of Muncie*, 655 N.E.2d 614, 622 (Ind. App. 1995); *City of South Bend v. Fleming*, 397 N.E.2d 1075, 1077 (Ind. App. 1979). Indiana's excessive force standard effectively parallels the Fourth Amendment standard discussed above. See *O'Bannon v. City of Anderson*, 733 N.E.2d 1, 3 (Ind. App. 2000). Because of the same factual issues that bar summary judgment on the Fourth Amendment unreasonable force claim, summary judgment is denied for defendants on this [Indiana battery] claim. *Bowden v. Town of Speedway*, 539 F. Supp. 2d 1092, 1110 (S.D. Ind. 2008).

The Court should deny the Defendants' arguments against the battery claims on the same basis as plaintiff set forth on the excessive force claim. As outlined above in section 1983 Fourth Amendment analysis, the officers battered Ms. Northington. Further, the

Indiana Supreme Court has declared that use of excessive force is not conduct immunized by the law enforcement immunity under the Indiana Tort Claims Act. *Wilson v. Isaacs*, 929 N.E.2d 200 (Ind. 2010). Thus, the battery committed by the officers was not privileged or immune under Indiana law. Because the officers were acting within the scope of his employment, (Dkt. 80-3, 4, 5, 6, 7) their employer, the City of Indianapolis, can be liable for this battery.

### 6. The City of Indianapolis is not entitled to summary judgment on the state-law battery claim under Indiana's use-of-force immunity statute

The Defense cites a law passed in 2019 by Indiana's General Assembly which provide immunity from civil liability relating to use of force employed under certain circumstances. *See generally* IND. CODE § 34-30-21-1 *et seq.* This law went into effect on April 26, 2019. The incident at the church occurred on February 6, 2019, months before this law went into effect. Article I, Section 9, Clause 3 of the United States Constitution states that both federal and state government are prohibited from enacting ex post facto laws *Id.* This law would not be relevant to the case and applying it to this case would be ex post facto application of said law.

### A. Even if Indiana's use-of-force immunity statute applies, Eleanor Northington did not have the mens rea to commit a forcible felony due to her mental condition and the mental health crisis she was experiencing at the time of the incident.

At the time of the accident, Eleanor Northington was unable to appreciate the wrongfulness of her conduct. IC 35-41-3-6 states that "a person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense." At the

time of the incident at the church, Eleanor Northington did not have the ability to appreciate the wrongfulness of her conduct. She suffered from paranoid schizophrenia and had been off her medication for some time. She did not have a history of aggressive behavior. Eleanor Northington did not have the mens rea to commit a forcible felony at the time of the incident. For these reasons, The City should not be entitled to summary judgment on the state-law battery claim under Indiana's use-of-force immunity statute.

### 7.  The officers committed battery

The civil claim of battery is the touching of a person in a rude and insolent manner against his will. *Franklin General Ins. Co. v. Hamilton*, 126 Ind. App. 537, 541 (1956). Further, a battery may also be reckless committed where one acts in reckless disregard of the consequences, and the fact that the person does not intend that the act shall result in an injury is immaterial. *Mercer v. Corbin*, 117 Ind. 450, 20 N.E. 132 (1889); *Reynolds v. Pierson*, 29 Ind. App. 273, 64 N.E. 484 (1902). *Rardin v. T.&D Machine Handling*, 890 F.2d 24, 28 (7th Cir. 1989)("the injurer takes his victim as he finds him and is therefore liable for the full extent of the injury even in unforeseeable"); Cf *Sentilles v. Inter-Caribbean Shipping Corp.*, 361 U.S. 107 (1959) Whether the officers intended to cause injury or not to Ms. Northington does not factor into battery analysis, or the Section 1983 excessive force analysis as stated above. The fact that the officers placed Ms. Northington in a prone position on her stomach and Officer Cooper put 160 pounds of weight on her back by placing his knee there and intended to do so suffices for the tort of battery. The City is responsible for the harm caused by that intentional act through vicarious liability because they employ the five officers.

In the case before the Court, the evidence, when viewed most favorably to the Plaintiff demonstrates that Ms. Northington was experiencing a mental health crisis, morbid obesity, unresisting, had a fabric cloth placed over her face and not a direct threat to officers or others after being restrained with handcuffs. The evidence also demonstrates that the officers forcibly put Ms. Northington on her stomach and one of the officers place a knee in her back, causing positional asphyxia and ultimately her death. The Court should deny the Defendants' arguments against the state law battery claims on the same basis as plaintiff set forth on the federal excessive force claim in violation of the Fourth Amendment as outlined above. Without question, there are genuine disputes of material fact that need to be resolved by the jury as it related to the State of Indiana excessive force claim asserted by Ms. Northington.

## 8. Plaintiff's Expert Witnesses

### 1. The Delay in Providing Discovery was justified

If The Estate's expert disclosures were untimely, it was justified. Both sides had difficulty scheduling depositions and conducting discovery and agreed to push the non-expert discovery deadline to February 22, 2022, which is the same date as the expert discovery deadline. This caused a delay in experts being able to finish their reports. The Estate provided the reports to the Defense as soon as their experts provided them with said reports.

### 2. The Defendants were not harmed by an unintentional discovery violation.

29

The Estate filed its initial Expert Witness List with on February 24, 2022. On March 11, 2022, The Estate emailed Defendant's counsel it's expert disclosures, omitting one report that it had not yet received from one of its experts on March 11, 2022. Plaintiff then served Defendants their completed expert disclosures on April 8, 2022, via certified mail, more than a month before the expert discovery deadline [Dkt. 80-16]. As of February 24, 2022, Defendants had the names and identities of all the experts The Estate planned on calling and adequate time to conduct discovery of those experts. This situation differs *Est. of Green v. City of Indianapolis* (854 Fed. Appx. 740, 744 (7th Cir. 2021), in the above-mentioned case, the Estate was 75 days late in disclosing their expert witnesses, leaving little to no time for the Defense to conduct expert witness discovery. In the current case, the Defense knew the identities of The Estate's experts as early as February 24, 2022.

The expert discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case. See Fed.R.Civ.P.26(a)(2) advisory committee's note (stating that expert disclosure rule intended to give opposing parties "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."); *Gorby v. Schneider Tank Lines, Inc.,* 741 F.2d 1015, 1018 (7th Cir. 1984). In this instance, The Estate disclosed the names of their experts by February 24, 2022, and full reports from their expert witnesses by March 11, 2022, thus preventing the chance that unfair surprise would hamper the defendant's preparation of the case. Trial was still a long way off and the defendants had plenty of time to prepare their examinations of The Estate's Expert Witness. Rule 37 does not require sanctions

against a non-disclosing party if that party's violation is harmless. In this instance, the Defense has not been harmed if there was a discovery violation.

### III. CONCLUSION

There are questions of material fact on the Section 1983 claims asserted against Defendants  and the Defendants are not entitled to qualified immunity on the Estate of Eleanor Northington's claims. There are also questions of material fact on Eleanor Northington's state law battery claim against both the officers in their individual capacities and against the City of Indianapolis. The Defendants' Motion for Summary Judgment should be denied.


Dated
Respectfully submitted,


Larry Pleasants, Attorney for Plaintiff

31

<u>CERTIFICATE OF SERVICE</u>

I certify the foregoing MEMORANDUM IN RESPONSE TO DEFENDANT'S MOTION FOR

SUMMARY JUDGMENT was electronically served on this ⟍⟍ day of April, 2022 via email

on the following parties:

Adam S. Willfond
Deputy Chief Litigation Counsel
Adam.willfond@indy.gov

Benjamin G. Stevenson
Paul A. Jansen
THRELKELD STEVENSON
bstevenson@threlkeld-legal.com
pjansen@threlkeld-legal.com

John F. Kautzman
Andrew R. Duncan
Edward J. Merchant
Martin A. Brown
RUCKELSHAUS, KAUTZMAN, BLACKWELL, BEMIS, DUNCAN, & MERCHANT LLP
jfk@rkblegalgroup.com
ard@rkblegalgroup.com
ejm@rkblegalgroup.com
mab@rkblegalgroup.com

/s/ Larry Pleasants
Larry Pleasants, Attorney for Plaintiff
7508 Madison Ave., Indpls., IN 46227
(317) 881-8900
ID#10661-49
larry@larrypleasants.com