UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ESTATE OF ELEANOR NORTHINGTON, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CITY OF INDIANAPOLIS, ) <br> ) <br> Defendant. ) | Case No. 1:21-cv-00406-TWP-TAB |

**ORDER ON MOTION FOR JUDGMENT
AS A MATTER OF LAW AND FOR NEW TRIAL**

This matter is before the Court on Defendant City of Indianapolis' ("the City") Motion for Judgment as a Matter of Law and for New Trial (Filing No. 202). Following a three-day jury trial on the issue of liability, commencing on February 20, 2024, the jury returned a verdict in favor of the Plaintiff, the Estate of Eleanor Northington's ("the Estate"), and against the City, on its state law *respondeat superior* claim for battery (Filing No. 193). At the conclusion of a separate, bifurcated trial held on the issue of damages, held before the same jury, the Estate was awarded $500,000.00 in compensatory damages on the claim. *Id.* The City now renews its motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and moves for a new trial pursuant to Federal Rule of Civil Procedure 59. In a separate pleading, the City has filed Motion for Remittitur (Filing No. 204). This Order addresses only the liability verdict finding the City liable to the Estate for battery. For reasons explained below, the Motion for Judgment as a Matter of Law and for New Trial is **denied** as to the issue of liability.

**I. LEGAL STANDARD**

Rule 50 provides that judgment may be entered against a party who has been fully heard on an issue during a jury trial if a "reasonable jury would not have a legally sufficient evidentiary

basis to find for the party on that issue." *Passananti v. Cook Cnty.*, 689 F.3d 655, 659 (7th Cir. 2012) (quoting Fed. R. Civ. P. 50(a) (motion for judgment as a matter of law)); *see* Fed. R. Civ. P. 50(b) (renewed motion for judgment as a matter of law).  In deciding a Rule 50 motion, the court construes the evidence strictly in favor of the party who prevailed before the jury and examines the evidence only to determine whether the jury's verdict could reasonably be based on that evidence. *Id.*  The district court must "give the nonmovant 'the benefit of every inference' while refraining from weighing for [itself] the credibility of evidence and testimony." *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 601 (7th Cir. 2019) (quoting *E.E.O.C. v. Costco Wholesale Corp.*, 903 F.3d 618, 621 (7th Cir. 2018)).  Although the court reviews the entire record, the court "must disregard all evidence favorable to the moving party that the jury [was] not required to believe." *Passananti*, 689 F.3d at 659 (alteration in original) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).

In the end, the court "reverse[s] the verdict only if no rational jury could have found for the prevailing party." *E.E.O.C. v. AutoZone, Inc.*, 707 F.3d 824, 835 (7th Cir. 2013) (citing *Bogan v. City of Chicago*, 644 F.3d 563, 572 (7th Cir. 2011)).  Phrased differently, "a motion for a judgment as a matter of law can be granted only if the court — after viewing the evidence in the light most favorable to the non-movant — believes that the evidence 'supports but one conclusion — the conclusion not drawn by the jury.'" *Mejia v. Cook County*, 650 F.3d 631, 634 (7th Cir. 2011) (quoting *Ryl-Kuchar v. Care Ctrs., Inc.*, 565 F.3d 1027, 1030 (7th Cir. 2009)).

Unlike Rule 50, a new trial under Rule 59 may be based on "any reason" recognized by federal law.  Fed. R. Civ. P. 59(a)(1)(A).  This most commonly takes one of two forms: the trial was fundamentally unfair to the movant or the jury's verdict went against the manifest weight of the evidence. *Ruiz-Cortez v. City of Chicago*, 931 F.3d 592, 602 (7th Cir. 2019) (quoting *Venson*

*v. Altamirano*, 749 F.3d 641, 646 (7th Cir. 2014)). Under Rule 59, however, a "new trial should be granted 'only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.'" *Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017) (citation omitted).

## II. FACTUAL BACKGROUND

Prior to trial, the parties stipulated to certain facts, thereby extensively narrowing the scope of the factfinder's focus (*see, e.g.*, Filing No. 123; Filing No. 159). The Court now draws upon the trial stipulations, witnesses' sworn testimonies, and admitted exhibits that were relevant to the only question before the jury: did the police officers commit a battery against Eleanor Northington ("Ms. Northington")?

**A.      Ms. Northington's Excited Delirium and the Events prior to her Fall to the Ground**

The evidence at trial is that on February 6, 2019, Ms. Northington began experiencing manic and erratic behavior, so her daughter, D'Asia Montgomery ("Ms. Montgomery"), drove her to Christ Our Healer to attend a 7:00 p.m. church service in an attempt to calm her down (Filing No. 123 at 1). Ms. Montgomery brought her mother to the church because the preacher at Christ Our Healer would pray for people and ask God to heal them as part of his mission. (Filing No. 197 at 92). 

During the service, Ms. Northington began to exhibit erratic and violent conduct. (Filing No. 123 at 2). An off-duty Indianapolis Metropolitan Police Department ("IMPD") officer who had arrived at the service before Ms. Northington, Officer Bruce Jackson ("Officer Jackson"), intervened. *Id.* at 2, 3. Officer Jackson is a Behavioral Health Specialist who had encountered more than fifty (50) mentally ill individuals, and he observed Ms. Northington exhibit bizarre, aggressive, and violent behavior. *Id.* at 3.

3

Ms. Northington — who weighed more than three-hundred pounds, was sweating profusely, and appeared to have startling physical strength — was experiencing excited delirium. *Id.* Officer Jackson witnessed Ms. Northington exhibit signs that IMPD General Order 8.1 instructed may indicate a subject's "potentially dangerous" state of hypothermia resulting from excited delirium, and would indicate a "greatly increased risk" of positional asphyxia if the subject were to be placed in a prone position that interfered with breathing (Tr. Ex. 117 at 5, art. III ¶ B; *see* [Filing No. 197 at 130](#)). Ms. Montgomery, explained to Officer Jackson that her mother, Ms. Northington was a paranoid schizophrenic, and had been off her medication for two to three years ([Filing No. 123 at 3](#)).

At 8:23 p.m., Officer Jackson radioed police dispatch to request assistance, and around 8:33 p.m., officers Robert Haley, Jr. ("Officer Haley") and Lane Cooper ("Officer Cooper") arrived at the church. *Id.* at 3. Officer Haley responded to the scene first, and he met Officer Jackson in the foyer, who explained what had gone on and that Ms. Northington appeared mentally ill ([Filing No. 197 at 114](#)). Officer Haley requested an ambulance at 8:34 p.m. ([Filing No. 123 at 4](#)).

Upon entering the sanctuary, Officers Haley and Cooper observed Ms. Northington sitting in the pews near the back of the church. *Id.* Officer Haley approached her, and she approached and punched him in the face. *Id.* Afterwards, she approached and started hitting Officer Cooper. *Id.*

Officers Haley and Jackson attempted to restrain Ms. Northington in handcuffs, but she actively resisted. *See id.* Officer Cooper grabbed one of Ms. Northington's arms and Officer Jackson grabbed the other. *Id.* Officer Justin Hyde ("Officer Hyde") arrived to assist with the incident, and he saw a group of people standing and engaged in a struggle in the church pews. *Id.*

4

After Office Hyde arrived, Ms. Northington broke her arm away from Officer Jackson and used it to "hammer fist punch" Officer Cooper in the back of his head. *Id.* at 5.

Within a few minutes from the time that Officer Cooper and other officers entered the church, they managed to get three sets of handcuffs on Ms. Northington with her hands behind her back while she was seated in or leaning against the pews. *Id.* It took approximately four to five minutes to get her in handcuffs (Filing No. 197 at 117).

A. **Ms. Northington's Fall and the Officers' Actions as She Lay on the Ground**

Officer Ronald Monday ("Officer Monday") arrived at the church and saw officers standing near Ms. Northington, who was detained in handcuffs and sitting in the pews, but was still twisting, thrusting, and wildly moving (Filing No. 123 at 5).

The officers moved Ms. Northington to the center aisle, during which time she continued to resist and twist, tripped on a bench, and fell and ended up in the aisle. *Id.*; *see* Filing No. 197 at 121. Officer Jackson also fell (Filing No. 123 at 5), as did others involved (*see* Filing No. 197 at 40).

Getting up, Officer Jackson walked between the pews "for a while" and was away from her "maybe three, three minutes or so." *Id.* at 122, 123. When he turned back to Ms. Northington, he observed her lying in the "prone position," or on her stomach. *Id.* at 122; *see id.* at 123. The officers had placed Ms. Northington on the floor in the center aisle (Filing No. 123 at 5).

Ms. Northington continued to thrash, kick, resist, and move around while on the floor in the center aisle (Filing No. 123 at 5). In order to try to secure Ms. Northington's legs and keep others safe, Officer Hyde placed his hands and knees on her legs to try to secure and control them. *Id.* at 6. When asked at trial if he ever saw Officer Cooper place a foot or knee on her back, Officer Haley answered affirmatively and testified that he "did see a knee, yes," and "[i]t was in her lower

5

back." (Filing No. 197 at 42.) This trial testimony was echoed by Officer Monday's testimony. *See id.* at 235.

Officer Hyde heard Ms. Northington state, "get off of me" (Filing No. 123 at 5). At trial, Officer Haley indicated he also believed she was saying, "Get off of me" (Filing No. 197 at 82).

At some point, Officer Haley heard a snoring noise from Ms. Northington and "knew something wasn't right." *Id.* at 46. Immediately after she was rolled on her back, Officer Haley realized the Ms. Northington was perhaps not breathing. *Id*. at 51. The officers backed off, Officer Hyde checked her pulse, and then officers took turns at chest compressions until an ambulance and emergency medical technicians arrived and ultimately took Ms. Northington back to the ambulance. *Id.* at 49, 50–51. The medics reported that Ms. Northington did get her pulse back before she was transported to a hospital. *Id*. at 52.

At trial, Officer Haley testified similarly to Officer Jackson and agreed that language in IMPD General Order 8.1 — concerning the warning signs which would result in a greatly increased risk of positional asphyxia when combined with prone positioning — described Ms. Northington's activities on the day in question. *See id.* at 58–59. Officer Jackson testified that his training taught that, "when somebody is in a prone position, once that person is detained is to merely roll them over on their side." *Id.* at 122. When asked if that was to be done "[i]mmediately," he answered "[o]r when you're able to." *Id.*

When the Estate concluded its case-in-chief, the City moved for judgment as a matter of law under Rule 50(a), which the Court denied after hearing argument (*see* Filing No. 198 at 36–42). After the City conducted and concluded its case-in-chief, the City renewed its motion for judgment as a matter of law under Rule 50(b), which the Court denied after hearing argument. *See*

6

*id.* at 53–57. The jury returned a verdict on liability, and subsequently in a bifurcated trial on damages, a verdict of $500,000.00 in favor of the Estate ([Filing No. 193](#)).

### III. DISCUSSION

The City argues the jury's finding of liability for battery lacked a sufficient evidentiary basis, contending that the only eyewitness testimony about what transpired while Ms. Northington was on the floor supported "the officers' version of events" — a version of events that had them merely "attempting to help Ms. Northington during her mental health crisis", and the officers never acted in a rude, angry, or insolent manner ([Filing No. 203 at 12](#); 14) (emphasis omitted). The City also maintains that the Estate provided no evidence demonstrating a lack of legal authority for the officers' actions in touching her. *See id.* at 12, 15.

Under Indiana law,

> [a]n actor is subject to liability to another for battery if (a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) a harmful contact with the person of the other directly or indirectly results.

*Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) (internal citations omitted). In the criminal context, that requires proof that a "person … knowingly or intentionally . . . touche[d] another person in a rude, insolent, or angry manner …." Ind. Code § 35-42-2-1(c). Indiana law also provides that an individual is justified in engaging in conduct otherwise prohibited if he has legal authority to do so. *Campbell v. City of Indianapolis*, 2011 WL 5088633, at *5 (S.D. Ind. Oct. 25, 2011) (citing Ind. Code § 35-41-3-1).

The final jury instruction agreed upon by the parties instructed the jury that,

> [t]o establish liability from the Defendant, the Plaintiff must prove all of the following by a preponderance of the evidence:
>
> > (1) the Defendant touched Eleanor Northington;
> > (2) knowingly or intentionally;
> > (3) in a rude, insolent, or angry manner;

7

(4) without the legal authority to do so.

(Filing No. 188-1 at 19.)

### A. The Jury was Not Prejudiced by the Estate's Counsel's Conduct

As a preliminary matter, the Court addresses the City's contention that the jury was prejudiced. Because the plaintiff in this case is the Estate of Eleanor Northington, Ms. Northington's status as a decedent was obvious and relevant. The parties' joint stipulations explained clearly that Ms. Northington was deceased, and the cause of her death was not an issue before the jury (*see* Filing No. 159). The jury was likewise instructed they were to treat this stipulation as a fact to which the parties agreed (*see* Filing No. 188-1 at 17) and that their duties were instead to decide the relevant facts and apply the law on battery that the Court would provide to the facts of the case (*see id.* at 2). The Court is confident that, provided these final instructions, the members of the jury properly understood they were not to make any decision about, or consider at all, Ms. Northington's cause of death.

The City nevertheless takes exception with the trial conduct of the Estate's counsel, reasoning that he persistently raised the issue and put before the jury her cause of death in "intentional[] disregard[]" of the Court's pretrial orders[1] (Filing No. 203 at 10).

Though the City's consternation with the Estate's lawyering is certainly understandable, the Court ultimately does not share the same concerns about improperly prejudicing the jury *as it*

---

[1] The position now taken by the City — that the jury was prejudiced by opposing counsel's conduct — presupposes that the City's trial advocacy did not or could not adequately safeguard against it. Conversely, the Court found defense counsel to be vigilant and, in many instances, effective in their advocacy. The example of Dr. Felo is illustrative in this respect. As a pretrial matter, defense counsel objected to Dr. Felo's testimony, arguing that as a pathologist, he was "really a damages witness and should not testify until" the damages portion of the trial (Filing No. 197 at 6). After the Estate's eventual proffer, during which the Court heard and considered argument from both parties, *see id.* at 195–198, the Court sustained the City's objection, permitting the testimony only in the second trial, were it to occur. *Id.* at 198. Demonstrations like this played their part in insulating the jury and precluding improper considerations.

*relates to the issue of liability*. First, the Court does not agree with the insinuation by the City that Estate's counsel was formally admonished for improperly raising the issue of Ms. Northington's death (*see* Filing No. 203 at 10, 15–16). Rather, the Court admonished counsel for his inappropriate "commentary" during witness examination and other generalized disregard of the Court's courtroom practices and procedures rules (Filing No. 197 at 249; *see id.* at 249–250), an issue that was cumulatively improper and deserving of admonishment — but sufficiently distinct from and unrelated to improvident ventures into Ms. Northington's "cause of death" that would prejudice the jury.

Second, after pouring over the transcript of the first trial, the Court finds the Estate's counsel sufficiently complied with its pretrial orders such that he did not "hint[]" or "present[] evidence or testimony" that the alleged battery "proximately caused 'brain death' or death." (Filing No. 164 at 5.) The lengthy exchange found in the City's briefing on the motion for judgment as a matter of law — which was "designed to elicit sympathy" and to inspire in the minds of the jury "wrongful death types of damages" (Filing No. 203 at 16) — was not conducted until the *second* trial on the issue of damages (*compare id.* at 16–17 (quoting trial testimony and sidebar), *with* Filing No. 200 at 7–9 (transcript)). Again, this Court will address the issue of the damages verdict and the parties' arguments concerning it, in combination with the City's motion for remittitur, in due course. Here, the Court cannot agree that, on balance, the first trial was fundamentally unfair to the City or the conduct exhibited by the Estate's counsel to have perpetuated a miscarriage of justice.

B. **The Jury Had an Adequate Evidentiary Basis to Find that the Officers Battered Ms. Northington**

The Court now shifts its focus to the evidentiary basis upon which the jury relied in finding against the City. Before doing so, however, the Court recites the rather simple theory of the battery

9

tried by the Estate to the jury, since that may be helpful to those confused by what the jury found from the evidence to be clear.[2]

In a state of excited delirium, Ms. Northington ended up on the ground. Police officers, instead of turning her over, allowed her to lay prone for *longer than they should have — i.e.*, longer than was "absolutely necessary" per IMPD general order guidelines (Tr. Ex. 117 at 4, art. III ¶ A.1) — given her size and their awareness of her openly exhibited signs of excited delirium. This was a rude or insolent touching. Then, at some point, an officer's hands and knees were placed on her legs, and a knee was placed in her lower back. More rude or insolent touching. Combined, these heightened her risk for positional asphyxia, "[a] condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to loss of consciousness or death," *id.* at 1, which is itself a third rude or insolent touching. And, while the police may have had legal justification to restrain her initially, that justification evaporated at some point prior to the rendering of aid — either due to the length of time she was actually prone or as a result of the combination of her prone position with the particular restraining methods used (hands and knees on legs, knee on lower back).

In the succinct words of the Estate's counsel, albethey outside of the presence of the jury: "In the case of putting a person on their stomach, with excited delirium, the rule is to get them off their stomach ASAP. . . . So the timing is the issue.… that's an issue of training on the part of the police department." (Filing No. 198 at 55.) Counsel made arguments to the same effect expressed

---

[2] The recount by the Court of the Estate's theory of the battery that follows is not to the exclusion of other theories also tried by the Estate, or issues discussed by counsel or mentioned during the witnesses' testimony — say, for example, that of the cloth placed near Ms. Northington's face, or the timing of the ambulance call in relation to the other events. The Court is cognizant that both considerations may have ultimately factored into the jury's verdict. Nevertheless, the Court provides what it sees as the most straightforward account of the battery borne out by the evidence for purposes of evaluating whether the jury had an adequate evidentiary basis for its verdict.

above, albeit more indirectly, in the latter half of his thirty-minute closing statement. *See id.* at 79–84.

The jury need not have improperly considered the cause of Ms. Northington's death to have decided from the evidence presented that the officers touched Ms. Northington knowingly, in a rude or insolent manner, without the legal authority to do so.

The police officers' testimonies of the events once Ms. Northington ended up on the ground is inconsistent at best, conflicting at worst, as to the length of time she lay prone, and the immediacy of the help rendered. For example, Officer Haley answered in the affirmative when he was asked on cross examination if "there was less than two minutes between when she was in the pew, when you fell, and when you guys realized something was wrong" (Filing No. 197 at 72), which appears to coincide with his previous answer on direct examination that it took "anywhere between 30 seconds to a minute" after Ms. Northington was on her stomach for him to hear a noise and "kn[o]w something wasn't right."[3] *Id.* at 45, 46. According to Officer Haley, "[t]here was no delay" from when he heard the snoring and when he acted to give aid. *Id.* at 73.

On the other hand, Officer Jackson's walk between the pews after being severely injured by falling as Ms. Northington fell removed him from her "maybe three, three minutes or so", *id.* at 123, after which time he turned to observe her lying in the prone position on her stomach. *See id.* at 122. At that point, and not before, he walked over and stated, "remove the handcuffs" and "[l]et's roll her over and start CPR." *Id.* at 123. The jury was permitted to believe Officer Jackson's

---

[3] The very same Officer Haley indicated moving Ms. Northington "from the aisle to the center aisle – or from the pew to the center aisle" alone took "maybe a minute, approximately a minute" (Filing No. 197 at 36), leaving by his account approximately one minute for all of the other events — falling, recovering, attempting to restrain Ms. Northington while she was prone, etc. — to occur, before officers proceeded to provide aid to her.

11

account over Officer Haley's and thus find that at least three minutes transpired after the fall before officers began to render aid.

Moreover, during this period, Ms. Northington lay prone until officers altered her position — either onto her back directly, or first onto her side. At least three of the five officers on the scene engaged her as she lay prone (*see* Filing No. 197 at 164). Officer Hyde's shins, or knees and hands, were on Ms. Northington's calf, *id.* at 205–06, an officer, possibly Officer Cooper, had a knee in her lower back, *id.* at 42, and a third was at her head. *Id.* at 164. Notwithstanding that Ms. Northington continued to resist, the Estate must, as the nonmovant, receive the "benefit of every inference," *Ruiz-Cortez*, 931 F.3d at 601 (quoting *Costco Wholesale Corp.*, 903 F.3d at 621), meaning that the jury could have inferred that, under the circumstances of this case, officers left Ms. Northington lying prone for a "period of time longer than [was] absolutely necessary" (Tr. Ex. 117 at 4, art. III ¶ A.1).

Likewise, the jury heard, and were able to assess in light of the other evidence, the testimony by the officers about the related General Order 8.1 mandate that subjects "should be moved onto their side . . . as soon as possible." *Id.* at 4, art. III ¶ A.2. Officer Jackson testified, "when somebody is in a prone position, once that person is detained [training says] to merely roll them over on their side." (Filing No. 197 at 122.) When asked whether "two minutes" was "as soon as possible", Officer Hyde obfuscated and stated: "That is the point in which she stopped flailing and kicking." *Id.* at 215. The inference as to whether Ms. Northington could have been moved to her side before or after she stopped resisting must be resolved in her favor as the nonmovant, as must the successive inference of whether or not the movement of Ms. Northington to her side occurred "as soon as possible".

In short, the Court does not find, based on the evidence presented at trial, that "no rational jury could have found for the prevailing party." *AutoZone, Inc.*, 707 F.3d at 835. Although, as the City argues, the parties "stipulated the Defendant had lawful authority to detain her and place her in handcuffs" (Filing No. 203 at 15; *see* Filing No. 123 at 6), that lawful authority is not absolute. The jury had every right to reasonably find that whatever authority existed initially, was undone as circumstances evolved. At least two officers heard Ms. Northington state, "get off of me" (*see* Filing No. 197 at 82; Filing No. 123 at 5), while she struggled on the ground with officers on top of her. A reasonable jury could conclude from the evidence presented at trial that officers were not justified in maintaining Ms. Northington's prone position as she struggled, either for as long as they did and/or in combination with the restraining methods that were used. "Though the evidence . . . is slight, drawing the above inferences it cannot be said, based even on the evidence developed during the plaintiff's case-in-chief, that 'there is absolutely no reasonable basis for a jury to find for the plaintiff.'" *Williams v. Long Island R.R. Co.*, 196 F.3d 402, 407 (2d Cir. 1999) (quoting *Syverson v. Consol. Rail Corp.*, 19 F.3d 824, 828 (2d Cir. 1994)); *see also Kyles v. Beaugard*, No. 15-CV-8895, 2023 WL 5277882, at *7 (N.D. Ill. Aug. 16, 2023) ("Rule 50 imposes a 'high bar.'") (quoting *Ruiz-Cortez*, 931 F.3d at 601).

For these same reasons, the Court further finds the jury verdict on liability for battery is not contrary to the weight of the evidence.

### III. CONCLUSION

Accordingly, the City's Motion for Judgment as a Matter of Law and for New Trial (Filing No. 202) is **DENIED as to the issue of liability**.

Before ruling on the remaining issues raised in this Motion and in the Motion for Remittitur (Filing No. 204), the Court believes a conference with the Magistrate Judge might be fruitful. Accordingly, the Court **ORDERS the parties to schedule a telephonic settlement conference**

with Magistrate Judge Tim A. Baker. The Magistrate Judge's minute entry will alert the Court as to whether the remaining issues have been resolved, or whether the Court should promptly rule on the remaining issues.

**SO ORDERED.**

Date: 4/26/2024

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Larry W. Pleasants
LARRY PLEASANTS, PROFESSIONAL CORPORATION, ATTORNEY
larry@larrypleasants.com

Anthony W. Overholt
FROST BROWN TODD LLP
aoverholt@fbtlaw.com

Brandon E. Beeler
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
brandon.beeler@indy.gov

Kiely C Keesler
CITY OF INDIANAPOLIS, OFFICE OF CORPORATION COUNSEL
kiely.keesler@indy.gov